GILCHRIST v. GODMAN et al.

(District Court, N. D. Illinois.   April 5, 1897.)

1. SALVAGE—WRECKERS HIRED TO RAISE VESSEL ARE NOT SALVORS—RIGHT TO COMPENSATION.
   Wreckers employed by the master of a wrecked vessel to raise the wreck, not being salvors. are entitled to wages for their labor, reasonably and faithfully performed, whether it is successful or not.

2. MARINE INSURANCE—LIABILITY OF UNDERWRITERS FOR SERVICES IN RAISING WRECK.
   Insurers of a wrecked vessel, who send an agent to superintend the master's efforts to raise the wreck, become jointly liable with the owner for the pay of wreckers employed by the master.

3. SAME—EFFECT OF ABANDONMENT ON OWNER'S LIABILITY.
   An abandonment of a wrecked vessel by the owner, after an attempt to raise it has proved unavailing, does not relieve the owner from liability to pay men employed in such attempt.

4. ADMIRALTY—JURISDICTION OF ACTION FOR WRECKER'S WAGES — MARITIME CONTRACT.
   A contract to raise a wrecked vessel is sufficiently maritime in its nature to give a court of admiralty jurisdiction of a suit to recover wages due under it.

Libel by Frank W. Gilchrist against Annetta S. Godman and others.

Robert Rae, for libelant.

John C. Richberg and Schuyler & Kremer, for respondents.

GROSSCUP, District Judge (orally). The libel is for services in connection with an attempt to save the schooner American Union, stranded about May 6, 1894, at Thompson's Harbor, on Lake Huron. The vessel was at the time of the stranding owned by the respondent Annetta S. Godman, and insured for about two-thirds its value in the respondent insurance companies. The master of the vessel at the time was James P. Godman. When the vessel stranded, her master employed the libelants to come to her assistance with tugs, pumps, hawsers, lights, and other wrecking appliances calculated to take her off the beach. The libelants entered upon this undertaking, and continued therein until about the 18th of May, when it was supposed that the vessel had been saved. On the 19th a fresh wind came up, which had the effect of pounding her to pieces upon the shore, leaving no salvage, except a few chains and other like things, not amounting to over $300 in value. While the libelants were engaged in their work, under employment of the master, an agent of the underwriters was sent on their behalf to assist in the work. He came on the 13th of May, and remained for several days thereafter, participating actively in the superintendence of the work, giving directions, and approving what the master had already done. After the 19th of May, and when it was known that the vessel was totally lost, the owner served upon the underwriters notice of her total abandonment of the vessel.

It will be observed that the relation of the libelants to the vessel in distress was not that of salvors at large. They did not offer their help or impose their services. They were called from a distant port by the master, and entered upon their work in pursuance of that call. Their claim for services, had the vessel been saved, could not, under the terms of the employment and the customs on Lake Michigan, have been based upon any idea of a proportionate interest in the value of the vessel, growing out of their having been her salvors. Their relation was not that of men coming at a venture to a vessel in distress, but of regular wreckers and tug men, who were employed at a customary compensation to give assistance. In my judgment, no feature of salvors at large enters into this case, but it brings, rather, the claim of a class of men who work for certain customary wages; and this, independently of the success or failure of their efforts. It is plain, then, that the men employed under such circumstances are entitled to wages from their employer independently of the outcome of their labor, such labor having been reasonably and faithfully performed in pursuance of the engagement.

Who were their employers? Undeniably the master of the vessel was one, who also by that act, as between her and the employed, bound the owner. I am of the opinion, also, that the underwriters, in view of their large interest in the work of the libelants, and by sending Capt. Sinclair to the scene of the work to participate, and, to some extent, superintend the same, intended to avail themselves of this employment. Their acts in this connection were, in effect, an adoption or ratification of the master's engagement with these libelants. Indeed, it is inconceivable that, if the master had not already engaged these men, the underwriters, through their agents, would not

have done so. They undoubtedly intended to join with the master in these efforts to save the vessel; their pecuniary interests and their conduct were all in that direction. I hold, therefore, that the libelants were the employés jointly of the owner and the underwriters, in this effort to save their common property.

I hold also that the so-called abandonment of the vessel, after she was already lost, does not have the effect of exempting the owner from her just share of liability for this employment. A proceeding so completely after the fact cannot affect the relative liabilities of the parties with relation to an effort intended to avoid that fact. Had the vessel been saved, or partially saved, there would, of course, have been no attempt at abandonment. To allow it now, as against these libelants, would be giving the owner the unfair option of choosing to pay her proportionate share if the services were successful, and escaping when she found they were unsuccessful.

The limitation act is not, in my judgment, in question in this case. Vessel owners and underwriters, employing men to save their vessels in extremity, make themselves, by such act of employment, liable to the extent of the contract price; and I think the contract sufficiently maritime in its nature, aided, as it is, by the statutes of the state wherein the services were rendered, to create a maritime action that would bring it within the jurisdiction of a court of admiralty. A decree may be entered finding for the libelants, and against the libelees, one-third of the liability against the owner, the other two-thirds against the underwriters, in proportion to their interests in the vessel.