GILCHRIST et al. v. CHICAGO INS. CO. et al.[1]

(Circuit Court of Appeals, Seventh Circuit. May 19, 1899.)

No. 446.

1. ADMIRALTY—APPEALS—QUESTIONS REVIEWABLE.

Under section 11 of Act March 3, 1891, creating the circuit courts of appeals (26 Stat. 826, c. 517), which provides that "all provisions of law now in force regulating the methods and system of review through appeals or writs of error shall regulate the methods and system of appeals and writs of error provided for in this act in respect of the circuit court of appeals," an appeal in an admiralty cause, which by such act is taken to that court instead of to the circuit court, as formerly, is to be heard and determined under substantially the same rules and limitations that regulated the determination of admiralty appeals in the circuit courts prior to the passage of that act; and, under the settled rule, such an appeal vacates entirely the decree of the district court, and brings the cause up for trial de novo upon every issue raised by the pleadings, those determined by the district court in favor of the appellant as well as those determined against him.

2. MARINE INSURANCE—ABANDONMENT OF VESSEL—LIABILITY OF UNDERWRITERS FOR SERVICES IN SAVING VESSEL.

An abandonment of a vessel to the insurers after her loss relates back to the time of the disaster, and the title becomes vested in the under-

---

[1] Rehearing denied March 2, 1900.

writers as of that date, and they are responsible for reasonable expenses incurred by the master after that date in an attempt to save the vessel, especially where they were represented at the place of the disaster by an agent during a large part of the time the work is being done, and approved the action of the master.

3. SAME—EXTENT OF LIABILITY.

In such case the underwriters become the owners by the abandonment, as of the date of the disaster, of the entire vessel, and not merely of the insured interest, each being a part owner in the proportion that his insurance bore to the entire insurance; and each is liable, under Act June 26, 1884 (23 Stat. 53, 57, c. 121, § 18), for the same proportion of the entire indebtedness incurred by the master for work done in the attempt to rescue the vessel.

Appeal from the District Court of the United States for the Northern District of Illinois.

In Admiralty.

Robert Rae, for appellants.

C. E. Kremer and John C. Richberg, for appellees.

Before HARLAN, Circuit Justice, and WOODS, Circuit Judge.

HARLAN, Circuit Justice. The case made by the amended libel is as follows:

On or about the 6th of May, 1894, the schooner American Union, owned by the respondent Annetta S. Godman, while prosecuting a voyage on Lake Huron, was stranded at Thompson's Harbor, and thereafter, on the 19th of May, 1894, went to pieces and became a total wreck.

Before and at the time of the disaster the respondent companies were underwriters on the vessel, as follows: Chicago Insurance Company of Chicago, $1,500; London Assurance Company of London, England, $1,500; Western Assurance Company of Toronto, Canada, $2,000; and Commercial Union Assurance Company of London, England, $1,000.

At the time of the insurance the vessel was valued at $9,000, so that its owner became and was her own insurer for $3,000.

The respective policies of the underwriters provided that "no abandonment in any case whatever, even when the right to abandon may exist, shall be held or allowed as effectual or valid, unless it shall be in writing, signed by the insured, and delivered to the said company or its authorized agent; nor unless it shall be efficient, if accepted, to convey to, and vest in, the said insurance company an unincumbered and perfect title to the subject abandoned."

On the 19th of May, 1894, James Godman, the master and attorney in fact of the owner, made a verbal abandonment of the vessel, and afterwards, on the same day, in accordance with the provisions of the policies, made a like abandonment in writing, serving the respondents with proofs of loss on the 4th day of June, 1894. No objection was made to the abandonment on the part of the underwriters.

The policies also contained a provision that, "in case of loss or misfortune to said vessel, it shall be lawful and necessary to and for the insured, her agents, factors, servants, and assigns, to give insurers

prompt notice of the disaster, and submit the plan adopted for recovering and saving the property, and to make all reasonable exertions in and about the defense, safeguard, and recovery of the said vessel, or any part thereof, without prejudice to this insurance; and after recovery and the holding of a survey, made under oath by two persons, * * * the insured is to cause the same to be forthwith prepared in accordance with the surveyors' specifications;" and they further provided that "to the expenditures and amount whereof the said insurance company will contribute according to the proportion the sum insured bears to the valuation aforesaid."

While the vessel lay stranded, as above stated, the respondents employed libelants, the present appellants, as wreckers for the purpose of saving the vessel or as much thereof as could be saved.

In pursuance of that employment, the libelants went to the wreck with a large and valuable amount of wrecking apparatus, tackle, apparel, and furniture, box hawsers, lighters, and diving outfits, and a large number of men, worked at and upon the vessel for a period covering (including the return of the outfit to the port of departure) some 30 days or more, and laid out and expended in the saving of the vessel, at the request of the agents of the respondents, a very large sum of money; the job being completed on or about the 18th of May, 1894.

The services so rendered were necessary and proper in order to save the vessel, and the prices charged for labor and materials, pumps, hawsers, lighters, and diving outfits, amounting to the sum of $3,665.75, with interest from May 18, 1894, were reasonable and customary for like services.

The libelants saved from the wreck the vessel's tackle, apparel, furniture, anchors, chains, boats, rigging, sails, and the like, which were taken possession of by the wrecking master of the underwriters and sold, the proceeds being received by him as the representative of the underwriters.

By the custom of the Great Lakes and seas, and by the maritime law, the salvage charges were in the nature of general average charges and expenditures, and by the custom of merchants were to be adjusted and paid as such.

An adjustment of the expenditures was made at the port of Chicago, according to the custom at that port, by competent adjusters of marine losses, copies of the adjustment being served on the respondents, respectively, before the time fixed for the payment of the loss to the owner by the underwriters, and within 60 days from the date of abandonment and proofs of loss served by the owner upon the underwriters.

The libelants claimed that there was due to them the above sum of $3,665.75, with interest.

The Western Assurance Company of Toronto in its answer denied that it ever employed the libelants or any one else as wreckers for the purpose of saving the vessel or as much thereof as could be saved, or that it ever authorized the employment of the libelants or any one else for that purpose, or that the libelants in pursuance of any agreement with the respondent performed the wrecking services

set forth in the libel, and averred that, if any of the salvage mentioned in the libel was received and sold by any one, it was not as its representative or agent or on its behalf. It alleged that it insured the owner of the vessel against loss by the perils of navigation for $2,000, upon a valuation of $9,000 for the vessel, with the right to demand other and further insurance upon the vessel for $4,000, leaving an uninsured interest at the risk of the owner of the vessel of $3,000, so that the interest of the respondent amounted to and did not exceed a two-ninths interest, and it could in no event be held liable for any charges or claims incurred on behalf of the vessel to the extent of more than two-ninths thereof. It further alleged that in consequence of the loss of the vessel, together with her freight, if any there was pending, the same was totally lost, and was of no further value, and respondent claimed the benefit of the act of congress passed June 26, 1884, and of the eighteenth section thereof, wherein it is provided that the individual liability of one who has an interest in the vessel shall be limited to the proportion of any and all debts and liabilities which such interest in the vessel bears to the whole, and that the aggregate liabilities of such interest in the vessel on account of the same shall not exceed the value of the vessel and freight pending. The respondent, in claiming the benefit of that act, said that by the total loss of the vessel and her freight pending it was not liable for the whole or any part of the claim of the libelants, and that if any liability ever existed the same was and became extinguished by the total loss of the vessel and her pending freight.

Similar defenses were made by the other underwriters, who filed a joint answer to the amended libel.

Respondent Annetta S. Godman, in her answer to the original libel, after stating that the vessel became a complete wreck, and that the master gave notice of the abandonment of the vessel to the underwriters, averred that as soon after such abandonment as she had opportunity to do so, namely, on the 4th of June, 1894, she served her proofs of loss on the insurance companies, executing a written abandonment as required by the policies of the respective companies; that on the same day she conveyed all her right, title, and interest in the vessel, her bills of sale and abandonment being duly accepted by the companies without objection; and that afterwards all of the underwriters paid the full amount of her loss to the extent of the face of the policies. She also averred that the underwriters by virtue of the abandonment became from the moment of the casualty the owners of the vessel, and that she (respondent) ceased to have any interest therein, and that the master of the vessel became the master of the underwriters from that time until the vessel became a total loss. She further insisted that in consequence of the abandonment and loss of the vessel, together with her freight, if any there was pending, the vessel became and was a total loss, and was completely destroyed, and of no further value to her at the moment of the casualty; but if it should be found that she was owner of any interest in the vessel after the moment of the casualty, or would be liable for any portion of the salvage services, she claimed the benefit of the act of congress of June 26, 1884, § 18.

After the district court filed its opinion in the case (79 Fed. 970), but before a decree was entered, that court, on motion of the libelants, dismissed the libel as to the respondent Annetta S. Godman.

A decree was rendered in the district court adjudging that the libelants recover from respondents, the underwriters, the sum of $2,296, or two-thirds of the amount claimed, each underwriter paying in proportion to its interest in the vessel. From that decree the libelants have prayed and were allowed by the district court an appeal to this court. In a petition for an appeal which was allowed August 2, 1897, the libelants stated that they would seek a new decision on so much of the cause as denied to petitioners the whole of their demand.

After the decree in the district court the respondents filed what is called in the record a "writ of cross errors," to the effect that the court erred (1) in finding that the respondents were not entitled to the benefit of the act of congress passed June 26, 1884; (2) in finding that the respondents, and each of them, were not entitled to limit their liability for the libelants' claim to the amount and value of so much of the schooner American Union as was saved by their efforts; (3) in finding that the respondents employed or contracted with the libelants, or ratified the contract and employment of the libelants by Capt. Godman; and (4) in finding that there was any sum whatever due from the respondents, or either of them, to the libelants, and in entering a decree against the respondents.

1. The appellants contend that the present appeal was from so much of the decree as denied the full amount of their claim, and that the case can be heard in this court de novo only as to that part of the decree. The contention of the appellees, on the other hand, is that the appeal vacates altogether the decree of the district court, and that the cause may be heard de novo in respect of every matter covered by the pleadings.

Prior to the passage of the act of March 3, 1891 (26 Stat. 826, c. 517), creating the circuit court of appeals, it was well established that on an appeal in admiralty from a district court to a circuit court the cause was to be tried anew, as if no decree had been rendered. In Yeaton v. U. S., 5 Cranch, 281, 283, 3 L. Ed. 101, Chief Justice Marshall said:

"The majority of this court is clearly of opinion that in admiralty cases an appeal suspends the sentence altogether, and that it is not res adjudicata until the final sentence of the appellate court be pronounced. The cause in the appellate court is to be heard de novo, as if no sentence had been passed. This has been the uniform practice, not only in cases of appeal from the district to the circuit courts of the United States, but in this court also."

In The Lucille, 19 Wall. 73, 22 L. Ed. 64, the court, speaking by Mr. Justice Miller, said:

"An appeal in admiralty has the effect to supersede and vacate the decree from which it is taken. A new trial, completely and entirely new, with other testimony and other pleadings, if necessary, or if asked for, is contemplated,—a new trial, in which the judgment of the court is regarded as though it had never been rendered. A new decree is to be made in the circuit court. This decree is to be enforced by the order of that court, and the record remains there. The case is not sent back to the district court for executing the decree, or for any other proceeding whatever, and that court has nothing further to do with it. The decree should therefore be complete within itself."

In Irvine v. The Hesper, 122 U. S. 256, 266, 7 Sup. Ct. 1181, 30 L. Ed. 1178, Mr. Justice Blatchford, delivering the unanimous judgment of the court, said:

"The claimants not having appealed to the circuit court, it is suggested that they are liable for at least the amount awarded by the district court, and that the circuit court could not reduce that amount, but had jurisdiction, on the actual appeal, only to increase it. It is well settled, however, that an appeal in admiralty from the district court to the circuit court vacates altogether the decree of the district court, and that the case is tried de novo in the circuit court. We do not think that the fact that the claimants did not appeal from the decree of the district court alters the rule. When the libelants appealed, they did so in view of the rule, and took the risk of the result of a trial of the case de novo. The whole case was opened by their appeal, as much as it would have been if both parties had appealed, or if the appeal had been taken only by the claimants."

See, also, The Charles Morgan, 115 U. S. 69, 75, 5 Sup. Ct. 1172, 29 L. Ed. 316, and The Louisville, 154 U. S. 657, 14 Sup. Ct. 1190, 25 L. Ed. 771.

We do not think that the rule has been changed by the above act of March 3, 1891, under which an appeal from a district court goes to the circuit court of appeals, and not to the circuit court. The clause in that act (section 11), that "all provisions of law now in force regulating the methods and system of review through appeals or writs of error shall regulate the methods and system of appeals and writs of error provided for in this act in respect of the circuit court of appeals," does not prevent a circuit court of appeals, when hearing an appeal in admiralty, from exercising all the power that a circuit court could have exercised in a like case prior to the act of 1891. On the contrary, that clause implies that an admiralty appeal by the libelant in the circuit court of appeals, under the act of 1891, is to be heard and determined under substantially the same rules and limitations that regulated the determination of admiralty appeals in the circuit courts prior to the passage of that act. It results that this court may properly consider and determine every issue raised by the pleadings, and, without regard to the decree below, direct such a decree to be entered here as is consistent with law. If, in our judgment, the libelants are not entitled to a decree in any amount,—and such is the contention of the underwriters,—we may dismiss the libel, notwithstanding the underwriters did not themselves directly appeal from the decree.

2. The facts as to the stranding of the vessel, the employment of the libelants by the master, the verbal abandonment to the underwriters, followed by a written abandonment and service of proofs of loss on the 4th of June, 1894, are substantially as stated in the amended libel. It may be here stated, in the words of the district court, that although it was supposed, on the 18th of May, that the vessel had been saved, "on the 19th a fresh wind came up which had the effect of pounding her to pieces upon the shore, leaving no salvage, except a few chains and other like things, not amounting to over $300 in value. While the libelants were engaged in their work under the employment of the master, an agent of the underwriters was sent on their behalf to assist in the work. He came on the 13th of May,

and remained for several days thereafter, participating actively in the superintendence of the work, giving directions, and approving what the master had already done."

What was the effect of the abandonment, so far as the underwriters were concerned? Plainly, such abandonment related to the time of the original disaster, May 6, 1894, and the title became vested in the underwriters as of that date. If this be so, it would seem, upon principle, that the underwriters cannot escape responsibility altogether for the expenses reasonably incurred under the direction or employment of the master after the stranding of the vessel, particularly when, as in this case, they were represented at the place of the disaster during a large part of the time when efforts were made to save the vessel, and, in effect, approved all that was done by the libelants and the master. In the case of The Sarah Ann, 2 Sumn. 206, 210, Fed. Cas. No. 12,342, Mr. Justice Story said:

"When a loss takes place for which an abandonment may be made, the master is not exclusively the agent of the original owners of the ship, but he is the agent of those who retroactively become owners of the ship in consequence of that event, if an abandonment is made and is justifiable. The common doctrine is that the master is the agent of all concerned in the voyage, and that he becomes, by relation, the agent of the underwriters, whenever an abandonment has been accepted, from the time of the loss to which the abandonment refers, although the abandonment may not have been offered or accepted until months after the event."

In Wallace v. Insurance Co. (C. C.) 22 Fed. 66, 73, Mr. Justice Matthews said:

"If the loss is partial only, then the expenses incurred are to be borne by each in proportion to the interests covered by the policy and those at the risk of the owners. But if the loss, under the terms of the policy, is a total loss, whether actual or constructive, any expenditures made by either constitute a part of the loss, and, as by the abandonment the whole interest in the subject of the insurance vests in the insurer, the whole expense falls upon him, without recourse upon the insured."

So, in 2 Phil. Ins. § 1708, p. 382:

"An abandonment, considered as an assignment of property, must have reference to the time of the loss, for only that which is constructively lost can be abandoned, and, to know what is lost, reference must necessarily be had to the time of the loss. From that time the insurers are, to most purposes at least, entitled to the advantages and subject to the liabilities of ownership. This is not inconsistent with the principle that the right of abandonment depends upon the state of the existing facts; which means, as we have seen, that the facts of which the assured is informed, and which he makes known to the underwriters as the ground of his abandonment, must constitute a total loss, and also that the loss must not have ceased to be total in the meantime. The abandonment must be authorized by the existing facts, but as an assignment it operates retrospectively from the time of the loss."

"A valid abandonment," says Kent, "has a retrospective effect, and does of itself, and without any deed of cession, and prior to the actual payment of the loss, transfer the right of property to the insurer to the extent of the insurance; and if, after an abandonment, duly made and accepted, the ship should be recovered, and proceed and make a prosperous voyage, the insurer, as owner, would reap the profits." 3 Kent, Comm. 319.

In Arn. Ins. (2d Ed.) p. 1178, it is said:

"The true principle seems to be that it thus acts as a transfer, not only from the time that notice of abandonment is given, but, by a retrospective

operation, from the moment of the casualty that gave the right to abandon, from which time the underwriters, by virtue of the notice of abandonment, are subrogated into the place of the assured, as complete owners of the abandoned property, so far as it is covered by the insurance.".

See, also, Abb. Shipp. p. 117, note; Lown. Ins. § 263; Insurance Co. v. Svendsen, 77 Fed. 220, 228; and Coolidge v. Insurance Co., 15 Mass. 341, 346.

3. Assuming that the written abandonment to the underwriters had the effect to place them in the position of owners of the vessel, as of the date of the disaster, to what extent were they liable for the expenses incurred in the efforts to save the property between the stranding of the vessel and the date of the service upon them of the written proofs of loss? We are of opinion that the eighteenth section of the act of June 26, 1884 (23 Stat. 53, 57, c. 121), furnishes the answer to this question. That section provides:

"Sec. 18. That the individual liability of a ship-owner shall be limited to the proportion of any or all debts and liabilities that his individual share of the vessel bears to the whole; and the aggregate liabilities of all the owners of the vessel on account of the same shall not exceed the value of such vessel and freight pending: provided, that this provision shall not affect the liability of any owner incurred previous to the passage of this act, nor prevent any claimant from joining all the owners in one action; nor shall the same apply to wages due to persons employed by said ship-owners."

The liability of the underwriters in the present case arises, not from any personal contract by them with the libelants, but from the rule of law which, in the case of a valid abandonment, makes the insurer the owner of the vessel from the time of the original disaster. If there be more than one underwriter, each one, after a valid abandonment, has an interest in the property, as owner, to the extent of its insurance as compared with the aggregate insurance by all the underwriters, and each is liable, upon that basis, for all expenses reasonably and properly incurred after the disaster in order to save the vessel, not exceeding the value of the vessel and the freight pending; that is, within the limit prescribed by the act of 1884, the underwriters are liable not as partners, but each for itself, to the extent of its interest in the vessel, and the interest of each is determined by the proportion which the amount insured by it bears to the whole insurance on the vessel. Upon the abandonment by the insured the underwriters became, as of the date of the disaster, the owners of the entire interest, right, and title of Mrs. Godman, and, if the vessel had been saved and restored to its original condition, they would have reaped any profits arising from such restoration. So that the liability of the underwriters must be ascertained upon the basis of their ownership after the abandonment, and as of the date of the original disaster, of the entire property, and not upon the basis that one-third of the property not insured was to be deemed the property of Mrs. Godman. The fact that the libelants might have looked to her, as the original owner, upon her personal contract, made with them through her agent, does not relieve the underwriters from the liability arising out of their becoming the owners of the entire property from the date of the disaster, in virtue of the abandonment to

them. Nor did the dismissal of the libel as to Mrs. Godman affect the rights of the libelants as against the underwriters.

In this view, the district court erred in adjudging that the respondent companies were liable only for two-thirds of the claim of the libelants. Each underwriter is liable for such part of the whole claim as is represented by the amount it insured as compared with the whole insurance on the vessel. Let a decree be entered upon that basis

Judge SHOWALTER participated in the hearing, but not in the decision of this case.