MASON et al. v. MARINE INS. CO. et al.

(Circuit Court of Appeals, Sixth Circuit. July 2, 1901.)

No. 903.

1. ADMIRALTY—APPEAL—QUESTIONS REVIEWABLE.
   Where a decree disposes of a number of distinct claims, an appeal by one party from an adverse decision as to one of such claims does not bring up for review the other portions of the decree.

2. SAME—INTERVENTION.
   Marine insurers, who, by payment of a loss resulting from the injury of a vessel in collision, have become entitled by subrogation to a portion of the fund recovered by the owners from the vessel in fault, may intervene, and set up their claim thereto after a decree has been rendered in favor of such owners on a mandate from the appellate court, the issues raised by such intervention relating solely to the distribution of the fund recovered.

3. MARINE INSURANCE—EFFECT OF ABANDONMENT TO INSURER—RIGHT TO DAMAGES RECOVERED FOR COLLISION.
   The effect of the abandonment to the insurers of a vessel sunk in collision is to vest in the insurers not only the title to the property abandoned, or its proceeds, but also the right to whatever may be afterwards recovered or received as a compensation for the loss; and damages recovered from the vessel in fault for the collision, for the loss of prospective earnings of the vessel sunk, belong to the insurers, and not to the insured.

**4. SAME.**

The abandonment of a ship to the insurers for a constructive total loss vests the insurers with the entire ownership, together with all its incidents, notwithstanding the insurance may not have been for its full value.

Appeal from the District Court of the United States for the Eastern District of Michigan.

This case came here on a former appeal from a decree of the district court finding the steamers the Ohio, the Siberia, and the Samuel Mather all at fault for a collision which resulted in the sinking of the Ohio. 33 C. C. A. 667, 91 Fed. 547. The decree of the district court was reversed by this court as to the alleged fault of the Ohio upon the ground that no negligence on her part was shown, and directions were given in the mandate to enter a decree against the Siberia and the Samuel Mather for the damages sustained by the Ohio. Upon the reception of the mandate, a decree was entered in favor of the libelants and against the claimants and sureties for the Siberia and the Samuel Mather for the sum of $71,409.74, with interest and costs. The amount of this decree was duly paid into the registry of the court, and on a subsequent date, upon stipulation of the parties concerned, a considerable portion of the sum was distributed. At the time of the loss the Ohio was insured in the following insurance companies, viz.: The Marine Insurance Company, the Reliance Marine Insurance Company, the Mannheim Insurance Company, the Commercial Mutual Insurance Company, and the Commercial Union Assurance Company, Limited, to the amount, in all, of $51,175 upon a valuation, stated in the policies, of $58,500. Promptly after the collision and damage occurred, which was on the 19th day of May, 1890, the owners of the Ohio gave due notice to the insurance companies of their abandonment of the vessel as for a total loss. The formal abandonment, with proofs of loss, were delivered to the insurers on May 30, 1890. On October 8, 1890, the full amount of insurance was paid, and a conveyance of the Ohio was delivered to the insurance companies. The insurance companies having these policies on the Ohio at the time of her loss, and which insurance they had severally paid to the owners, filed their petition in the district court, praying that there be ordered paid to the petitioners the sum of $7,879.20, the amount alleged to have been recovered in the decree against the Siberia and the Samuel Mather, and claimed in the original libel as damages in the nature of demurrage, or the probable value of the use of the vessel for a time subsequent to the collision, and while she was detained for repairs; also for the sum of $1,719.55, being the probable net earnings of the Ohio on her voyage in which the collision occurred; also the sum of $233.75 for the loss of fuel then on board the Ohio. The owners of the Ohio contested this petition, and upon the hearing the court decreed that the petitioners were entitled to the first of the above-mentioned sums, namely, $7,879.20, which had been recovered as the probable net earnings of the Ohio after the collision, but denied the claim for loss of freight and for loss of fuel, which latter were considered to belong to the owner of the vessel. A decree was entered in conformity with these views, and thereupon the owners of the Ohio appealed to this court. The petitioners have not appealed.

John C. Shaw, George W. Weadock, and Byron S. Waite, for appellants.

Harvey D. Goulder and C. E. Kremer, for appellees.

Before LURTON and SEVERENS, Circuit Judges, and THOMPSON, District Judge.

SEVERENS, Circuit Judge, having made the foregoing statement, delivered the opinion of the court.

The supposed errors of which the appellants complain may properly be considered under the following heads: First. That the petitioners are not entitled to any recovery by these proceedings,

because they lost their opportunity to intervene, and slept upon their rights in that regard until after the entry of the final decree entered upon presentment of the mandate from this court; and, if they are entitled to recover any of these moneys from the owners of the Ohio, it must be done in another court and case. Second. They claim that all moneys recovered against the Siberia and the Samuel Mather for loss of probable earnings after the collision belonged to the owners of the Ohio. Third. They claim that, if the insurers are entitled to the prospective probable earnings of the Ohio, they, the owners, are entitled to share with the underwriters by reason of the fact that the vessel was only insured by all the several policies to an amount considerably less than her valuation in the policies, and that as to this difference the owners carried the risk. The right to the damages recovered for loss of freight on the voyage, and also the sum recovered for loss of fuel, were allowed to the appellants by decree of the district court, and, of course, they have no ground for complaint here, so far as those matters are concerned. But counsel for the appellees contend that the court below erred in refusing to allow these last-mentioned claims to the petitioners, and in answer to a doubt expressed by the court here whether, not having appealed, they were entitled to now make this contention, they say that those items were a part of the things disposed of by the decree, and that the appeal of the owners of the Ohio brought up the whole matter of the decree, and that, therefore, the whole subject was before the court. But we are quite clearly of the opinion that this contention cannot be maintained. It is doubtless true that, where the decree awards a balance which is the result of an adjustment of mutual accounts between the parties, an appeal from such decree might open the case for the consideration of an objection to the particular items which make up the general balance, provided the proper steps had been taken to bring those matters under the cognizance and power of the court. But this is not such case. The claims pursued are several and distinct grounds of recovery, and there is nothing in the nature of a mutual account.

Recurring, therefore, to the questions which are before us, we observe, first, that, in our opinion, the objection that the petition of the insurance companies was not seasonably presented is not well founded. It was not necessary that they should have intervened in the case prior to the entry of the decree of the district court under the order of this court, when the cause was remanded. There was nothing in the order of the mandate directing what decree should be entered, which prevented a subsequent application for a distribution of the fund recovered. There had been no issue in the case upon any such matter when it came here upon appeal, and, of course, there was nothing decided here which had any relation whatever to that subject. What we determined was the liability of the Siberia and the Samuel Mather for the damages suffered by the Ohio, and the fixing of the amount for which the respondents were liable. There was no question before the court relating to the ultimate destination of the funds, though it did undoubtedly establish the right of recovery between the then parties to the suit; but it de-

termined nothing more. When the money was paid into court, all the purposes of the decree, so far as the parties to the suit were concerned, were accomplished. The insurance companies had not been parties to the suit, and it was entirely competent for them, at any time before the final distribution of the fund was made, to intervene for the purpose of presenting their claim to an interest in the fund, and for its establishment by the decree of the court. Central Trust Co. v. Richmond, N. I. & B. R. Co. (C. C. A.) 105 Fed. 803–808 (a case decided by this court in December last); In re Howard, 9 Wall. 175, 19 L. Ed. 634; Williams v. Gibbes, 17 How. 239, 15 L. Ed. 135; The Elmbank (D. C.) 72 Fed. 610. The question which we are required to determine upon the merits is whether that part of the damages recovered for the prospective earnings of the Ohio, and resulting from the collision, belong to the owners of the ship or to the underwriters. When the case was here on the former appeal, this court, in considering a question of pleading, referred briefly to this question, but as, in the then state of the case, it was not necessary to determine it, it was expressly passed over without expressing any definite opinion upon it. The question turns upon the effect under the maritime law of an abandonment of the ship by the owner to the underwriters as for a constructive total loss. The rule upon this subject is, as we think, correctly stated in 1 Am. & Eng. Enc. Law (2d Ed.) p. 36, as follows:

"An abandonment devests the property of the thing abandoned out of the insured, and vests it in the insurer, together with all the rights of property and rights of action incident thereto, and all the burdens and liabilities in respect thereof, from the moment of the casualty to which the abandonment refers."

This rule was accepted by the supreme court of the United States at an early day, and has been steadily adhered to. In the case of Insurance Co. v. Stark, 6 Cranch, 268, 3 L. Ed. 220, there was an insurance of goods on board ship and in charge of the supercargo, Parker. The ship and goods were captured by a privateer, one of the perils insured against. Notice of abandonment was given to the insurance company. Parker, the supercargo, afterwards effected an arrangement with the owner of the privateer by which the vessel was released. The ship and goods were taken to the port of destination, where the latter was sold. Suit was brought upon the policy. It was held that no deed of cession was necessary, the notice of abandonment being sufficient, and that thereupon the title to the goods vested immediately in the underwriters. With respect to the effect of the abandonment, Chief Justice Marshall said:

"If the abandonment was legal, it put the underwriters completely in the place of the assured, and Parker became their agent. When he contracts on behalf of the owners of the goods, he contracts on behalf of the underwriters, who have become owners, not on behalf of Starr, who has ceased to be one."

There was a question whether the notice of abandonment was seasonably given, and the judgment in favor of the plaintiff was reversed, and a new trial ordered, but upon that ground only. That was a case of insurance upon the cargo, but the rule is essentially the same as in the case of insurance upon the ship, so far as con-

cerns the consequences of an abandonment. In the case of Comegys v. Vasse, 1 Pet. 193, 7 L. Ed. 108, which has always been considered a leading one, this subject was fully considered and elaborately discussed in an opinion by Mr. Justice Story. The object of the suit was to determine the ownership of a certain fund which had been distributed by the commissioners appointed by the United States in fulfillment of its stipulation in the treaty with Spain in 1819 to make satisfaction of the claims of our citizens upon the latter country for captures and losses enumerated in the treaty. Vasse had underwritten policies on several vessels and cargoes, which had been captured and taken into Spanish ports. The vessels had been abandoned to him, and he had paid the losses to owners, long before the date of the treaty. A material question in the case was whether the money distributed by the commissioners to satisfy the claim for these losses belonged to the owners of the captured vessels or to Vasse, the underwriter. This depended on the effect of the abandonment. And it was held that by that act the right to every sort of indemnity which might thereafter be awarded on account of the loss by reason of which the abandonment was made passed from the insured to the underwriter; and the doctrine of text writers was cited and approved, to the effect that the rights which pass are not limited to the specific property abandoned, or its proceeds, but include also "whatever may be afterwards recovered or received, whether in the course of judicial proceedings or otherwise, as a compensation for the loss." Almost contemporaneously with that decision the same rule, in substance, was laid down by Chancellor Kent in the third volume of his Commentaries, at page 319, where he says, in speaking of abandonment:

"In such cases the insurer stands in the place of the insured, and takes the subject to himself with all the chances of recovery and indemnity. A valid abandonment has a retrospective effect, and does of itself, and without any deed of cession, and prior to the actual payment of the loss, transfer the right of property to the insurer to the extent of the insurance; and if, after an abandonment, duly made and accepted, the ship should be recovered, and proceed and make a prosperous voyage, the insurer, as owner, would reap the profits."

And in the note to this passage:

"The benefit of the spes recuperandi passes, and all that may be collateral or incidental to the ownership."

It will be noticed that the chancellor uses the comprehensive expression "chances of recovery and indemnity" in describing the things which pass. Obviously, from that and the context, he intended to include every species of indemnity, and among these would be the obligation of the wrongdoer to make atonement to the owner of the vessel to the full extent of his loss. There have been many decisions in the federal courts since that time involving collateral points, and sometimes the rule itself, but that has always been considered as having been settled by the early authorities. It would not be profitable at this day to undertake particular discussion of them in detail. Some of the cases are these: The Monticello v. Mollison, 17 How. 152, 15 L. Ed. 68; The Potomac, 105 U. S. 635, 26 L. Ed. 1194; Railway Co. v. Jurey, 111 U. S. 584, 4 Sup. Ct. 566,

28 L. Ed. 527; Phœnix Ins. Co. v. Erie & W. Transp. Co., 117 U. S. 312, 6 Sup. Ct. 750, 1176, 29 L. Ed. 873; St. Louis, I. M. & S. R. Co. v. Commercial Union Ins. Co., 139 U. S. 235, 11 Sup. Ct. 554, 35 L. Ed. 154; The Brig Ann C. Pratt, 1 Curtis, 343, Fed. Cas. No. 409; Gilchrist v. Insurance Co., 44 C. C. A. 43, 104 Fed. 566.

In the English courts there is an unbroken line of authority in support of the general rule above stated in regard to the effect of an abandonment for a constructive total loss. From among their modern decisions we cite, as illustrating the English doctrine: Yates v. Whyte, 4 Bing. N. C. 272; Cammell v. Sewell, 3 Hurl. & N. 617; Miller v. Woodfall, 8 El. & Bl. 498; Association v. Armstrong, L. R. 5 Q. B. 244; Simpson v. Thomson, 3 App. Cas. 279; Insurance Co. v. Turner, 1 Macq. H. L. Cas. 334, reprinted in 9 Scots Rev. Rep. 312; Insurance Co. v. Hadden, 13 Q. B. Div. 706. The rule is thus laid down by Cockburn, C. J., in Association v. Armstrong, L. R. 5 Q. B. 244, 248:

"In case of total loss, whatever remains of the vessel in the shape of salvage, or whatever rights accrue to the owner of the thing insured and lost, they pass to the underwriter the moment he is called upon to satisfy the exigency of the policy, and does satisfy it."

In Simpson v. Thomson, supra, the lord chancellor, Lord Cairns, delivering the judgment of the house of lords, says that:

"The insurer becomes entitled to succeed to all the ways and means by which the person indemnified might have protected himself against or reimbursed himself for the loss. It is on this principle that the underwriters of a ship which has been lost are entitled to the ship in specie if they can find and recover it, and it is on the same principle that they can assert any right which the owner of the ship might have asserted against the wrongdoer for damage for the act which has caused the loss."

And Lowndes, in his work on Marine Insurance, at page 153, thus states the right acquired on abandonment:

"This cession or abandonment which accompanies a settlement gives to the insurers a right to all the advantages, direct and indirect, or ownership of the thing insured. Not only may they take possession of, sell, or otherwise dispose of the wreck or remains, but, if the assured is entitled, in virtue of the ownership had before, to any rights of action or recovery from third parties as for a contribution to general average, to recovery of damages against the wrongdoer in a collision suit, or the like, these rights pass by the abandonment to the underwriter."

Germane to the question we are considering, it should be noted that, having regard to the effect of an abandonment upon the right to recover freight, the doctrine is firmly established, both in this country and in England, that freight already earned at the time of the disaster on account of which the abandonment is made goes to the owner of the ship, or to the insurers of the freight if it be insured. This harmonizes with the rule, because in such case the right has matured, and is no longer an incident of the vessel. Where the freight is still pending, the English rule is (or has been) that, upon abandonment, the whole freight goes to the abandonee. This doctrine goes upon the ground that the right is immature at the time the voyage is interrupted, and therefore not detachable from the ship. On the other hand, many American authorities, basing their ruling upon what seemed to them a more equitable basis, have es-

tablished a variation from the English practice by awarding the pending freight, where it has been finally matured by the underwriter, to him and to the owner of the vessel pro rata itineris which each has accomplished. This American rule recognizes the fundamental doctrine by dividing the earnings of the vessel at the date of the disaster, the division itself being a device of equity in favor of the owner and the insurer of freight against a strictly legal and technical consequence. So far as we know, there has been no decision in either country that upon abandonment the owner may still assert against his abandonee the right to the prospective earnings of the vessel. A case very nearly in point is Miller v. Woodfall, 8 El. & Bl. 498, where the insured, after an abandonment, had gotten the ship off, and had carried part of his goods on board to their destination. It was held that the abandonees of the ship were entitled to be allowed at the current rate of freight for the carriage of that part of the cargo taken by the ship into port. A case much relied on by the appellants, and thought to be decisive of this, is that of Insurance Co. v. Hadden, 13 Q. B. Div. 706; also reported in 5 Asp. 230. But the case is distinguishable. The question there was whether the insurers were entitled to recover from the owner of the ship money decreed to him by reason of his having been deprived of profits under a contract of affreightment, upon which there was another insurance by other underwriters. Now, the contract of affreightment is not an incident of the ship. Freight is of itself, and independently of the ship, the subject of a contract of insurance. They are two entirely separate things, and there are many cases in the books where the courts have been employed in protecting the interests of the owner in respect of the contract of affreightment, and, through him, of insurers of freight, in cases of this sort; as in the case of Hickie v. Rodocanachi, 4 Hurl. & N. 455, where Lord Bramwell observed, having reference to the fact that the captain had fulfilled for the owner the contract of affreightment, that the captain in such a case as the present acts for the owners of the ship, and not for the underwriters, and they are not entitled to any benefit from the freight acquired. The underwriters may, indeed, be entitled to advantages attached to the ship, but not to those arising from contracts, the fulfillment of which can be and is detached from the ship, which, as often happens, the shipowners may fulfill by another ship. Considerations of this kind lie at the bottom of the rule in this country that the owner of the ship cannot recover as damages arising from collision the freight arising on a charter party. This was the ground on which the judgment in Insurance Co. v. Hadden was rested. Brett, M. R., in giving his opinion, after quoting what was said by Lord Bramwell in Hickie v. Rodocanachi, said:

"If the vessel is insured by one set of underwriters, and the freight is insured by another set, then whatever is salvage from the loss of the ship goes to the underwriters of the ship, and whatever is salvage from the loss of the freight goes to the underwriters of the freight. How, then, are the damages which have been recovered in this case from the owners of the colliding vessel made up? They are made up of damages given in respect both of the loss of the ship and of the loss of freight. Therefore one set of

damages ought to go to one set of underwriters, and the other set to the other. It seems to me to be conclusive that the underwriters on the ship cannot recover what they here claim, because it seems clear that this recovery of damages in respect of the loss of freight is not a salvage which is a salvage out of the loss of the ship."

The difference in the facts, and consequently in the principle of law applicable thereto, between that case and this, is obvious. The claim there in question was founded upon a subject which was held to be not an incident of the ownership of the vessel, and which had in fact been separated therefrom by the owner. The right of the underwriter on the ship was derived from the owner, and was affected by his status. If he could recover against the wrongdoer upon it, the damage would, as the master of the rolls said, go to the underwriters of the freight. Here the damages in question were not for the loss arising upon a charter party, but for the loss of the prospective earnings of the ship, the charter party being used as evidence merely upon the question as to how much they would probably have been worth. The earning power of the vessel was an incident inhering in her ownership. That earning power passed with the ship, and, as we have already seen, the abandonees were entitled to the use of it from the moment of the disaster. If the ship had not been completely disabled, but had remained in such plight that she could have completed her voyage, there could be no question but that her earnings subsequent to the collision would have belonged to the underwriters. If that had happened, it would pro tanto have diminished the amount recovered by the owners from the insurers. In point of fact, the injury was so grave as to completely disable the ship from earning anything during the time of her detention, and it is for precisely that period of time that the owners have recovered for her prospective earnings, and it is that sum which the underwriters claim was recovered in trust for them. We do not see how that claim can be denied without overturning the settled doctrines which apply to an abandonment. And there is really no hardship to the owners of the ship. The right to abandon as for a constructive total loss is a privilege given by the maritime law to enable the owner of the ship to forthwith realize the substance of the value of the lost vessel, so that he may reinvest it in another ship by purchase or charter, and continue in his enterprises. The exercise of that privilege casts upon the underwriter an extraordinary burden. Both parties have all these consequences in view when the contract of insurance is made. The vessel owner can never be compelled to abandon. When he does so, he acts upon an estimate of the whole situation, and all the consequences; and, of course, he will not exercise his privilege unless it is for his advantage. In such a case the right of the insurer does not depend upon the doctrine of subrogation, as that term is understood in courts of equity, and which is employed in working out the right of the insurer in cases of partial loss only. In such cases there is no change in the ownership of the vessel, and the right to its earnings continues with the owner as an incident of his ownership. On the other hand, when the ship is abandoned to the insurer, the title to the ship passes by assignment immediately to the insurer, as from the moment of the disaster, with every right

which is incident to it. The distinction is an important one, though it is sometimes confused in the language of judicial opinions. Inasmuch as it is a consequence of the abandonment that the underwriter becomes substituted to all claims and remedies for the loss, in addition to the title to the ship itself, it is impossible to say that the owner may still recover to his own use damages which depend upon his right to continued ownership. We have not been referred to any case where this precise question has been determined, nor have we been able to find any, and this has been the reason for our discussion of the subject upon the reasons and analogies suggested by the authorities.

It is further contended that, notwithstanding the abandonment, the owners of the ship retained an interest proportionate to the difference between the amount of the insurance and her valuation, and that, consequently, they are entitled to share in the sum in controversy as in the nature of salvage. This contention rests upon the ground that this difference represents an uninsured interest in the vessel, or, to put it in the way which is suggested by counsel, an interest in respect to which the owners were their own insurers. But it is a mere figure of speech to say that the owner is the insurer of his own property. In reality the only insurance is that which is contracted for. Nor is it true that, because the insurance is for less than the value, the insurance rests upon some fractional part of the ownership. The whole vessel, "the body and tackle, apparel, and other furniture," to use the language of the policies, is the subject of the insurance. When an abandonment takes place, the entire ownership passes; and it is usually stipulated, as it was here, that the notice thereof, if accepted, must be efficient to convey to and to vest in the insurers "an unincumbered and perfect title to the subject abandoned." There is no suggestion that some aliquot part of an ownership is to be assigned. The owner does not continue to be an owner as a tenant in common. In the present case, before the acceptance of the abandonment and settlement as for a total loss, the underwriters required the whole title to be conveyed to them, which was done. We think, however, that that would have been the result if no deed of cession had ever been executed.

This question has never been expressly decided by the supreme court, though there are several cases which employ language which, we think, implies that the understanding of the court has been in accordance with the rule which we suppose to be the correct one. For instance, in view of the fact that insurance is not ordinarily for the full value, we should have anticipated a qualification in the statement of the rule as to what would pass by an abandonment, if the owner were recognized as remaining a tenant in common as to part of the ownership by reason of the insurance being for less than the value of the ship. The rule applied by the district court has on several occasions been held to be the true one by the federal courts of first instance, and has been recently affirmed by the circuit court of appeals for the Seventh circuit, Mr. Justice Harlan delivering the opinion. Mutual Safety Ins. Co. v. Cargo of the George, Olcott, 89, 17 Fed. Cas. 1082 (No. 9,981); The Mary E. Perew, 15 Blatchf. 59, Fed.

Cas. No. 9,207; The Manitoba (D. C.) 30 Fed. 129; The Burlington (D. C.) 73 Fed. 258; Gilchrist v. Insurance Co., 44 C. C. A. 43, 104 Fed. 566. The rule is also recognized in The St. Johns (D. C.) 101 Fed. 469. There is some disagreement in state decisions upon this point, but, so far as we know, there has never been any difference of opinion in the federal courts. It seems to us that the maintenance of this claim of the owners would be to introduce a new doctrine into the law of abandonment, and one wholly inconsistent with its long-established principles.

Counsel for the underwriters refer, in support of their claim, to a clause in the policy which requires the insured, upon accepting payment for any damage or loss, to treat as assigned to them all rights to indemnity which the insured may have. But we think this language in the policy was employed to denote what should happen or result in cases of partial loss only, for in the preceding paragraph the subject of liability in case of abandonment for constructive total loss was fully provided for. We think the decree of the court below, so far as it is appealed from, is correct, and it is accordingly affirmed