## CONSOLIDATION COASTWISE CO. v. CONLEY.

### (Circuit Court of Appeals, First Circuit.   April 26, 1918.)

#### No. 1310.

1. SHIPPING ⬤84(1)—LIABILITY OF VESSEL—DUTY TOWARD STEVEDORE.

A stevedore employed by an independent contractor engaged to discharge the cargo of a vessel must be deemed to go upon the vessel at the invitation of the owner.

2. SHIPPING ⬤84(2)—LIABILITY OF VESSEL—INJURY TO STEVEDORE.

Where the owner of a vessel engaged an independent contractor to discharge the cargo, it should make reasonably safe those parts of the vessel which it can anticipate the stevedores of the contractor will use in going to and from their work.

3. SHIPPING ⬤84(3)—INJURY TO STEVEDORE—LIABILITY OF VESSEL—NEGLIGENCE.

Where a stevedore who had been unloading coal from a barge was injured in attempting to cross a hatch cover, *held*, that the owner was liable; the cover which had been replaced while the stevedore was at work in the hold not having been securely fastened.

4. SHIPPING ⬤84(5)—INJURY TO STEVEDORE—ASSUMPTION OF RISK.

A stevedore who attempted to cross a hatch cover which had been placed in position while he was at work in the hold *held* not to have assumed the risk of injury resulting from an insufficient fastening.

5. ADMIRALTY ⬤117—APPEAL—TRIAL DE NOVO.

In view of the previous practice in admiralty appeals from the District to the Circuit Court, and Rule 14, pars. 6–10 (150 Fed. xxxix, 79 C. C. A. xxxix), relating to the record in admiralty causes, the Circuit Court of Appeals hears an appeal in an admiralty case de novo and may increase the decree for libelant, though respondent alone appealed.

6. SHIPPING ⬤84(5)—INJURY TO STEVEDORE—CONTRIBUTORY NEGLIGENCE.

A stevedore who was injured while walking over a hatch cover which was insecurely fastened *held*, under the circumstances, not contributorily negligent.

Dodge, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the District of Maine; Clarence Hale, Judge.

Libel in personam by Michael Conley against the Consolidation Coastwise Company. From a decree for libelant for part of the damages claimed (242 Fed. 591), respondent appeals. Remanded, with directions to enter decree for libelant for the full amount of his injuries.

Gerry L. Brooks, of Portland, Me., for appellant.

Richard E. Harvey, of Portland, Me., for appellee.

Before DODGE, BINGHAM, and JOHNSON, Circuit Judges.

BINGHAM, Circuit Judge. This is a libel in personam brought by Michael Conley against the Consolidation Coastwise Company to recover damages for personal injuries which he sustained while employed as a stevedore by the A. R. Wright Company in discharging coal from the hold of barge No. 23, owned by the consolidation company. There was a trial in the District Court, and it was found that the respondent

was negligent and that the libelant was guilty of contributory negligence. An interlocutory decree was entered "that the libelant recover against the defendant," and an assessor was appointed to determine the damages, who filed a report assessing them in the sum of $1,812.75. The report was accepted and a final decree entered adjudging that the libelant recover one-half the damages sustained as found by the assessor, to wit, $906.37, with costs taxed at $133.32. From this decree the respondent appealed, and in its assignment of errors complains that the court below erred in finding that it was negligent and in making certain specific findings bearing upon the general finding; that it also erred in holding that the libelant did not assume the risk and in not dismissing the bill.

The evidence discloses that the respondent was engaged in operating seagoing vessels upon the Atlantic Coast, one of which was barge No. 23, a coal carrier; that this vessel had a single deck and three masts, and was about 215 feet long and 35 feet abeam. She had three sets of hatches, around all of which was built a hatch coaming. This coaming was stated by different witnesses as being 2, 2½, and 3 feet 10 inches high. No. 3 hatch was the after hatch, and between it and No. 2 hatch was a space or dead hatch in which the spanker-mast was stepped, and between the second and first hatches was another dead hatch in which the mainmast was stepped. Forward of No. 1 hatch was the foremast. The hatches were 36 feet long and 16 feet wide, and each hatch was divided into three bays 16 feet by 12 feet. When at sea the hatches were closed over with hatch covers resting on beams called strongbacks. These covers were built in sections of about 3 feet in width and 8 feet in length. There were three strongbacks to a bay placed lengthwise of the barge, one at the center of the hatch and one on each side thereof, about midway between the center and the coaming. It was the duty of the crew of the vessel to remove the hatch covers and strongbacks before docking the vessel to discharge, and to replace the same after the coal was discharged; the stevedores had nothing to do with them.

The barge on this occasion was drawn up port side to the Wright Company's dock, the hatch covers and strongbacks had been removed, and the booms hauled offshore, so as to clear the hatches and allow the stevedores to discharge the coal.

The libelant went to work on the morning of the day of the accident at about half past 9. He boarded the barge opposite the third hatch and went forward on the port side to the second hatch, where he crossed over the coal, stepped down upon the starboard side of the barge, and hung his coat on the main boom, at a point about midway between the coaming and the rail. He then went aft, on the starboard side, to hatch No. 3, where he worked until about 2 o'clock clearing out that hatch, with a crew of men. When the work there was finished, he came out of the hold and went forward, on the starboard side, to hatch No. 1, where he worked until a quarter of 7 at night. While he was working in the forward hatch, another crew was discharging hatch No. 2. The work in hatch No. 2 was finished about 5 o'clock. Having finished his work in the forward hatch, he came out of

the hold on the starboard side and went aft to get his coat. He found that the main boom had been changed from where it was when he hung his coat upon it; that it had been swung back over No. 3 hatch, fore and aft, at the center of the boat. Upon reaching a point opposite the center of this hatch, he stepped over the coaming and crossed the starboard side of the hatch to the main boom to get his coat, which he had hung in plain sight on the boom. He then put on his coat, stooped over, and stepped forward, under the boom, intending to go ashore, when he was precipitated into the hold, a distance of some 23 feet, breaking his left leg and three ribs.

The sail was furled above the boom and inclosed in a sail covering. From the underside of the boom to the hatch covers was between three and four feet, and the top of the sail covering came up to the libelant's chin.

The hatch covers when in position on the hatch inclined slightly from the center strongback to the coaming, and when removed were placed on the port and starboard sides of the deck, near their respective hatches. The morning of the day of the accident snow fell, and toward night it became clear and cold, and the snow and slush to a greater or less extent froze on the coaming and hatch covers. After the coal was removed from hatch No. 3, the captain ordered the engineer, with two deck hands, to cover the hatch and to follow up the work as the hatches were discharged. This order was given between 3 and 4 o'clock in the afternoon. After the order was given, the engineer and the two deck hands, having placed the strongbacks on the third hatch, threw the hatch covers upon the strongbacks and the coaming, beginning on the starboard side of the forward end of the hatch and working back. Having done this, they adjusted each cover in place, and then went to the port side of the hatch and threw up the hatch covers, beginning at the rear and working forward. They then adjusted the hatch covers on this side of the hatch. After the second hatch was discharged, they began covering it, beginning forward, on the starboard side, and working back in the same manner as before described. Having completed this work, they threw up the covers on the port side. There was evidence that some of the covers on the port side of No. 2 hatch were placed in position, but how many was not clearly shown. There was also evidence that the crew of the barge either left their work for supper without having attempted to place in position some of the covers, or, if they had undertaken to so place them, failed to remove the ice that had frozen on the coaming and the covers so that they could be properly adjusted.

After the covers on No. 3 hatch were adjusted, and after the covers on No. 2 hatch were placed as above stated, the spanker and main booms were swung in fore and aft over their respective hatches. Why the main boom was so swung in before the covers on the port side of No. 2 hatch were properly adjusted is in controversy. There was evidence that the engineer and deck hands left their work in this condition to go to supper, and there was also evidence that the work was being hurried so that the barge might be moved downstream that night by a tug that was waiting to perform this service.

It was customary to cover a hatch as soon as it was discharged, and this practice was known to the libelant, who had worked as a stevedore discharging barges some sixteen years. Counsel for the respondent contend that this was not so, but we think the reasonable conclusion to be drawn from the evidence is that such was the custom. There was evidence that men employed in discharging coal after the hatches were covered frequently made use of the hatches in passing from one side of the boat to the other. This was denied by the captain of the barge, but was acquiesced in by the engineer. It was also customary, when the hatch covers had been adjusted, to haul the booms in fore and aft over the center of the barge; but this was not done until after the hatch covers were adjusted, for to do so would interfere with the work of the crew in adjusting them.

It was dark at the time the accident occurred; there were no lights on the deck of the barge, and the lights in the hold of the first hatch, which the libelant had just left, did not light the deck. On the dock were two towers, from which were suspended either arc or incandescent lights; but at the time of the accident only one of these lights was burning.

[1-4] The libelant was not in the employ of the barge, but of an independent contractor with whom the owner had contracted for her discharge. The libelant, therefore, was upon the barge at the invitation of the owner (Pioneer S. S. Co. v. McCann, 170 Fed. 873, 96 C. C. A. 49; The Joseph B. Thomas, 86 Fed. 658, 30 C. C. A. 333, 46 L. R. A. 58; Leathers v. Blessing, 105 U. S. 626, 629, 26 L. Ed. 1192; Stevens v. United Gas & Electric Co., 73 N. H. 159, 60 Atl. 848, 70 L. R. A. 119), and it was its duty through its representatives to see that the barge, in so far as it knew or had reason to anticipate that she would be used by the libelant in going to and from his work and while at work, was reasonably safe. Upon due consideration of the evidence, we think that the respondent, through those in charge of the barge, knew, or reasonably ought to have known, that the libelant had hung his coat on the main boom, where it swung across the passage between the coaming and the rail, and that, when they moved this boom to a position over the center of the hatch, they had reason to anticipate that the libelant, on finishing his work, would go to the place he left his coat, and, finding that the main boom had been swung in over the hatch, and that the covers had been replaced on the starboard side, would go upon the hatch to get his coat. And in view of this, and the further fact that the respondent knew or was charged with knowledge that the stevedores, in passing from one side of the barge to the other, were accustomed to cross over the hatches when covered, we think it should have anticipated that the libelant, on recovering his coat, and finding that the hatch covers had been replaced on the starboard side and the boom swung in over the hatch, would attempt to go ashore across the port side of the hatch, and would be injured if it failed to use due care in properly replacing the hatch covers on that side; and that it was negligent in leaving the hatch covers as it did.

We are also of the opinion that there is no ground for the position taken by counsel for the respondent that the libelant assumed the risk

or crossing the hatch. The evidence all tends to show that his presence upon the hatch and consequent injury were due to the action of the respondent's representatives in moving the boom and coat to a point directly over the hatch, and in adjusting the main boom and the hatch covers on the starboard side so as to indicate that all of them had been properly adjusted, thus giving the libelant to understand that he might safely cross the hatch to the wharf. It cannot therefore be said that he knew, or ought to have known, of the danger, and appreciated the risk to which he was subjected. And, such being the case, it could not be ruled as a matter of law, or reasonably be found as a fact, that he assumed the risk.

The respondent's contention, as has been pointed out, is that the libelant's injury was due entirely to his own fault, and that the court below erred in not so finding and ruling. The libelant's contention, on the other hand, is that his injury was due solely to the fault of the respondent, and consequently that the court erred in finding and ruling that he was guilty of contributory negligence and apportioning the damages.

[5] Although the appeal in this case was taken by the respondent, we think it is, nevertheless, open to the libelant to have the question of his freedom from fault considered here. Prior to the passage of the act of 1891 (Act March 3, 1891, c. 517, 26 Stat. 826) establishing the Circuit Courts of Appeals, it was held in Irvine v. The Hesper, 122 U. S. 256, 7 Sup. Ct. 1177, 30 L. Ed. 1175, that an appeal in admiralty from a District Court to a Circuit Court vacated the decree of the lower court and permitted a trial de novo; and that this was true whether both parties appealed or only one, and without regard to which one. It was there said:

"It is well settled, however, that an appeal in admiralty from the District Court to the Circuit Court vacates altogether the decree of the District Court, and that the case is tried de novo in the Circuit Court. * * * We do not think that the fact that the claimants did not appeal from the decree of the District Court alters the rule. When the libelants appealed, they did so in view of the rule, and took the risk of the result of a trial of the case de novo. The whole case was opened by their appeal, as much as it would have been if both parties had appealed, or if the appeal had been taken only by the claimants."

Since the passage of the act of 1891, the question has often arisen whether, in an admiralty suit, an appeal to the Circuit Court of Appeals opens up the whole case for a new trial, and whether it is necessary, in case one party appeals, that the other should do likewise in order to have considered a question that may have been determined against him in the court below, and it has been held that the rule applied in Irvine v. The Hesper prevailed. The question has been nowhere more carefully considered than in the Second Circuit, in the case of Munson Steamship Line v. Miramar Steamship Co., 167 Fed. 960, 93 C. C. A. 360. It has also been recently passed upon by the Supreme Court in the case of Reid v. Am. Exp. Co., 241 U. S. 544, 36 Sup. Ct. 712, where it was said:

"At the threshold it is insisted that the court below [the Circuit Court of Appeals] had no authority to consider the case as before it for a new trial—that is, de novo—and to award relief upon that theory, and that consequently

it erred in reviewing the interlocutory decree, which was not appealed from, by which the steamship company was dismissed, and allowing a recovery against that company, and also in reviewing both the interlocutory and final decrees so far as it was essential to grant relief to the express company, because that company had not appealed. It is not denied that in the Second Circuit the right to a de novo trial was considered as settled by Munson S. S. Line v. Miramar S. S. Co., Limited, 167 Fed. 960 [93 C. C. A. 360], and that a well-established practice to that effect obtained; but it is insisted that a general review of the adjudged cases on the subject will show the want of foundation for the rule and practice. But we think this contention is plainly without merit, and that the right to a de novo trial in the court below authoritatively resulted from the ruling in Irvine v. The Hesper, 122 U. S. 256 [7 Sup. Ct. 1177, 30 L. Ed. 1175]—a conclusion which is plainly demonstrated by the opinion in that case, and the authorities there cited, and the long-continued practice which has obtained since that case was decided, and the full and convincing review of the authorities on the subject, contained in the opinion in the Miramar Case. Entertaining this view, we do not stop to consider the various arguments which are here pressed upon our attention, tending at least indirectly, to establish the nonexistence of the right to the trial de novo in the court below, or that this case, for reasons which are wholly unsubstantial, may be distinguished and made an exception to the general rule, because to do so would serve no useful purpose and would be, at least impliedly, to admit that there was room to discuss a question concerning which there was no room for discussion whatever."

See, also, Gilchrist v. Chicago Ins. Co., 104 Fed. 566, 44 C. C. A. 43, and The Nyack, 199 Fed. 383, 118 C. C. A. 67. In this circuit the decision in The Philadelphian, 60 Fed. 423, 9 C. C. A. 54, lends recognition to the rule that an appeal in admiralty gives a right to a trial de novo, and lays down rules for the transmission of evidence taken in the court below to the court of appeals, and the circumstances under which further proof may be taken in that court. See Rule 14, pars. 6, 7, 8, 9, and 10 (150 Fed. xxxix, 79 C. C. A. xxxix).

[6] Upon the question of the libelant's fault the respondent relies largely upon certain statements made by him in his testimony where he said that when he went under the boom he did not look to see if the hatch covers were on right; that they were there in front of him; that there was no light on the deck; and that he found the hatch covers on the starboard side were all right, and so proceeded to cross the port side. To charge the libelant with negligence because of what appears in this testimony is to overlook the circumstances leading up to the accident and surrounding him at that time. We think that the conduct of the respondent's representatives, as hereinabove particularly pointed out, was misleading; that it gave the libelant to understand that what was in fact unsafe was safe; that it lulled him into a feeling of security when otherwise he would have been apprehensive; and that under the circumstances he should be found to have acted as a reasonably prudent man and not be held to have been negligent.

The case is remanded to the District Court, with directions to enter judgment for the libelant for $1,812.75, with interest and costs.

DODGE, Circuit Judge (dissenting). I am unable to concur in so much of the opinion of the court as holds the libelant not chargeable with negligence contributing to his injuries. Not being satisfied that the District Court's finding upon this question was erroneous, I think the decree dividing the damages should have been affirmed.