GREAT LAKES TOWING CO. v. MILL TRANSP. CO.

(Circuit Court of Appeals, Sixth Circuit. July 30, 1907.)

No. 1,662.

1. SHIPPING—RIGHT TO LIMITATION OF LIABILITY—CONSTRUCTION OF STATUTE.
   Section 18 of Act June 26, 1884 (23, Stat. 57, c. 121 [U. S. Comp. St. 1901, p. 2945]), which provides that "the individual liability of a shipowner shall be limited to the proportion of any or all debts and liabilities

that his individual share of the vessel bears to the whole; and the aggregate liabilities of all the owners of a vessel on account of the same shall not exceed the value of such vessel and freight pending," and Rev. St. § 4283 [U. S. Comp. St. 1901, p. 2943], are in pari materia, and to be construed together. The provision of the older act by which the limitation of liability therein provided for is confined to things "done, occasioned or incurred without the privity of knowledge of such owner or owners," also qualifies the latter act, which was not intended to apply to liabilities of the owners of vessels for the consequences of their personal faults or upon obligations personally contracted by them.

[Ed. Note.—Limitation of owner's liability, see note to The Longfellow, 45 C. C. A. 387.]

**2. SAME—WRECKING SERVICE PERFORMED UNDER CONTRACT.**

A towing company entered into a contract with the managing agent of petitioner, which was the owner of certain vessels on the Great Lakes, by which it agreed to perform all towing and wrecking service required by such vessels during the season at certain stated prices. One of petitioner's vessels having stranded, the towing company was called on pursuant to said contract, and sent a tug with wrecking apparatus to the assistance of such vessel, where it spent several days in pumping and attempting to get her afloat, but unsuccessfully, and she was lost. *Held*, that section 18 of Act June 26, 1884 (23 Stat. 57, c. 121 [U. S. Comp. St. 1901, p. 2945]), did not entitle petitioner to a limitation of liability for the services so rendered by the towing company under its contract to the value of the salvage recovered from the wreck.

**3. PRINCIPAL AND AGENT—CONTRACT MADE BY AGENT—ADOPTION BY PRINCIPAL.**

If a principal not disclosed by a contract made by and in the name of his agent subsequently claims the benefit of it, the contract thereby becomes his own to the same extent as if his name had originally appeared as a contracting party.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 40, Principal and Agent, §§ 502, 503, 645.]

**4. SHIPPING—PERSONAL LIABILITY OF SHIPOWNERS—CONTRACTS MADE BY MANAGING AGENT.**

The contracts of a managing agent of a steamship company, within the sphere of his authority, are the actual contracts of the owner and not of the vessels to which they relate, as in case of contracts made by a master on a voyage or in foreign ports.

Appeal from the District Court of the United States for the Eastern District of Michigan.

H. D. Goulder, for appellant.
G. L. Canfield, for appellee.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

SEVERENS, Circuit Judge. The controversy in this case arose upon a petition of the appellee, the Mills Transportation Company, for an order limiting its liability for services rendered by the appellant in endeavoring to rescue the steamer Newago, a vessel belonging to the appellee, which had been stranded upon a reef in that part of Lake Huron, known as the Georgian Bay. The accident to the Newago occurred on November 17, 1903. Prior to this accident, and on July 9, 1903, the appellant addressed to H. McMorran, who was the managing agent for the appellee of the Newago and other of its vessels, as well as of other parties for other vessels, the following proposition:

"The Great Lakes Towing Company.

"Cleveland, Ohio, July 9th, 1903.

"To H. McMorran, Pt. Huron, Mich.:

"We hereby propose to furnish all the towing and wrecking services required by the boats under your management during the balance of the year 1903, ———, at points covered by the Great Lakes towing tariff for 1903, on the following terms:

"In consideration of your agreeing to have all of the boats under your management employ the tugs and wrecking appliances owned or specified by us during the balance of the year 1903, ———, at points covered by The Great Lakes Towing Tariff we will allow the following discounts from said tariff:

"Harbor Towing. At Chicago and Tonawanda 35 per cent. discount from said tariff, and at all other points 30 per cent. discount from said tariff, with a further discount in both cases of 10 per cent. for cash on all bills paid within the month following that in which the service is rendered.

"Wrecking or Bottom Work. A discount of 20 per cent. from said tariff, and a further discount of 5 per cent. for cash if bills are paid within the month following that in which the service is rendered.

"Soo. For landing stern barge at the Soo the rate to be $5.00 flat, without discounts, for each service.

"Lake Towing. When barges are transferred from port to port, where there is a lake tow, no charge to be made for the in tow.

"Maximum Rate. The maximum rate for and in and out tow at any port where only the one cargo is handled shall not exceed seventy-five dollars ($75.00) net each.

"All charges for labor, meals and other items representing cash advances shall be net, and payable on demand.

"These rates only apply to vessels actually engaged in the lumber trade, and refer only to boats of twelve hundred thousand capacity and under.

"We will endeavor to have tugs of suitable power on hand at all times to provide a first-class service, but shall not be held liable for damages in case we are not able at any time to furnish such service. In case, however, at any time, for any reason, we are unable to have tugs on hand to serve your boats, you are at liberty to engage any other tugs to serve you for that time, but without the right to charge us any difference in price.

"The vessels towed shall furnish good and sufficient lines.

"The Great Lakes Towing Company,
"By C. H. Sinclair, G. M."

This proposition was on its receipt accepted in the following language thereunder written:

"The undersigned, H. McMorran, mang. owner, manager of boats named below, hereby accepts the above proposition, for said boats and for the consideration named therein, agrees to cause said boats to employ the tugs, lighters and wrecking outfit owned or specified by The Great Lakes Towing Company, at points named in said The Great Lakes Towing Tariff, on above named terms, at all times during the balance of the year 1903 when they require such service. H. McMorran.

"Steamers.
"Steamer Gogebic,
"Steamer Newago,
"Steamer Pawnee,
"Steamer Britannic,
"Steamer Mary Groh,
"Steamer M. Ross.

"Consorts.
"Schr. Checotah,
"Barge M. E. Orton,
"Barge J. R. Edwards,
"Barge W. A. Young,
"Schr. Thos. Howland."

The vessels named in this list belonging to the Mills Transportation Company were the Gogebic, the Newago, and the Checotah.

Upon the happening of the accident to the Newago, her captain forthwith telegraphed to his principal, the Mills Transportation Company, that the Newago was ashore on Devil's Island Shoal leaking badly, and asking that a wrecking outfit be sent. The Mills Transportation Company were aware of the contract of the appellant with McMorran, and on receipt of the telegram above mentioned communicated with McMorran, who was then at Washington, but had left subordinates in his office at Port Huron. Through these subordinates, the request for the assistance of a tug and other wrecking outfit was made to the appellant, which thereupon dispatched the Favorite and wrecking apparatus to the scene of the disaster; and the appellee notified the captain of the Newago by telegram that this had been done. On arrival the Favorite found the Newago difficult of access, being in a place of great danger. But the Favorite stood by and endeavored for several days to rescue the steamer. Its efforts were unsuccessful, and the Favorite was finally discharged from further service. The Newago was lost and only about $156 in value of her remnants were saved. Subsequently the appellant presented to the appellee a bill for the services thus rendered as follows:

Dec. 3, 1903.

Steamer Newago, to the Great Lakes Towing Co., Dr.

For tug services at port of ————, Str. Favorite.
1903             From              to              Tug
                                                  Favorite.

Nov. 17 to 27 inclusive. To services rendered while steamer was
  ashore Devil's Island Shoal 10 days at $350.00 per day........ $3,500 00
To use 2-12″ steam pumps 10 days each, 20 days at $50 per day.. 1,000 00

                                                                $4,500 00

But the personal liability of the appellee for the bill was not admitted. We do not understand that the bill itself was objected to, but it was contended that there was no personal liability of the owner therefor, and that recourse was available only against the vessel of which the remnants above mentioned were the only parts in esse.

In this state of affairs the appellee filed its petition for the limitation of its liability. The remnants were appraised and a bond given by the petitioner for the sum of $250. The appellant appeared and filed its answer in opposition to the limitation prayed for in the petition, and its claim with a prayer for a decree for payment of the same. The court below held and decreed in favor of the petitioner that its liability be limited as prayed. Upon these facts we think the court below was in error.

By Act March 3, 1851, c. 43, 9 Stat. 635 (section 4283, Rev. St. [U. S. Comp. St. 1901, p. 2943]), it was enacted that:

"The liability of the owner of any vessel, for any embezzlement, loss, or destruction, by any person, of any property, goods, or merchandise, shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, lost, damage, or forfeiture, done occasioned, or incurred, without the privity or knowledge of such owner or owners, shall in no case exceed the amount or value of the interest of such owner in such vessel, and her freight then pending."

And by section 18 of the act of June 26, 1884 (23 Stat. 57, c. 121 [U. S. Comp. St. 1901, p. 2945]), it was further enacted that:

"The individual liability of a ship-owner, shall be limited to the proportion of any or all debts and liabilities that his indvidual share of the vessel bears to the whole; and the aggregate liabilities of all the owners of a vessel on account of the same shall not exceed the value of such vessel and freight pending: Provided, that this provision shall not affect the liability of any owner incurred previous to the passage of this act, nor prevent any claimant from joining all the owners in one action; nor shall the same apply to wages due to persons employed by said ship owners."

In a number of cases it has been held, and we have no doubt correctly, that these two provisions, relating as they do to the same class of persons and to the same subject, should be regarded as regulations in pari materia, and should be construed as parts of an entire scheme. We refer to this rule of construction of statutes in pari materia, because, as will be noticed, the words "done, occasioned or incurred, without the privity or knowledge of such owner or owners," which are contained in the act of 1851 are not employed in the act of 1884; and from this circumstance counsel for the appellees argues it was intended by the use of the words "debts and liabilities" in the later act to mean all debts and liabilities incurred on account of the vessel, whether with or without the privity or knowledge of the owner; whereas, if the act of 1884 were put to follow the act of 1851, so as to further provide for the application of the provision of the act of 1851, to the case of each individual shareowner of the vessel, and then sum up by declaring that all the liabilities of the owners on account of the vessel shall not exceed the value of the vessel and pending freight, the result would be that the condition of privity or knowledge of the owner would be carried along into the subsequent section. Another reason for thinking that the eighteenth section of the act of 1884 was intended as an extension merely of the relief provided by the act of 1851 is found in the fact that the act of 1851 contains provisions for the procedure in applying the limitation. One of these is by paying into court the appraised value of the ship and pending freight, the other by surrendering the vessel and freight. The owner of the ship might adopt either of these. The Scotland, 105 U. S. 24, 26 L. Ed. 1001. These privileges are analogous to those which the owner has in ordinary seizures, when he may give bond and release the vessel, or he may suffer the vessel to be condemned and sold. But the act of 1884 provides no procedure for administering its provisions. And this, we think, furnishes an inference that the act of 1851 was regarded as the basic law, to which section 18 of the act of 1884 was intended to be supplementary. And the provision of this alternative mode of procedure suggests a query whether this legislation does not contemplate that the liability of the ship is to be presupposed, and such a liability would not exist in case the owner had personally contracted the debt, and had not stipulated for a lien, either expressly or by fair implication. The St. Jago de Cuba, 9 Wheat. 409, 6 L. Ed. 122; The Grapeshot, 9 Wall. 129, 136, 19 L. Ed. 651; The Valencia, 165 U. S. 264, 17 Sup. Ct. 323, 41 L. Ed. 710; The Havana, 35 C. C. A. 148, 92 Fed. 1007. But we think there are other reasons of sufficient weight to lead to the

conclusion that the act of 1884 was not intended to have application to liabilities of the owners of vessels for the consequences of their personal faults or of obligations personally contracted by them. The purpose of Congress, was, as we think, to relieve the shipowner from the consequences of those extraordinary risks which were imposed without limitation by the law of the admiralty as that law had been interpreted in this country. And by extraordinary risks we mean those risks arising from the conduct of, and contracts made by, those who are beyond the personal supervision and control of the owner and yet have legal authority to bind him to answer for their conduct or contracts; or, to express the thought in another way, that the liabilities intended by this legislation were those peculiar to him as a shipowner and had been imputed to him because of his relation to the ship, and not those liabilities, whether for torts or from contracts, which spring from his own personal conduct or stipulations. It seems to us altogether unlikely that Congress intended to qualify the power of an owner to make contracts in relation to his ship which by the universal law would be valid if made about any thing else and would be enforced in the courts in common-law actions. It would be an anomaly that a party competent to do business should be unable to make a valid contract about his own affairs, or be given such an immunity as to make his stipulations of uncertain value. Such a doctrine would be inconvenient in the last degree to the owners of vessels and the interests of commerce. If in every case the party who should undertake to render assistance to other vessels on request of the owner should be dependent on the proceeds of the vessel for his compensation, he would be likely to consider the chances, and the sorer the need of the services the less likely would the owner be to secure them. Instead of relieving him of a burden, he would be burdened with the disability of pledging his personal credit for the securing of the needed assistance. Besides, the history of the law upon this subject furnishes an argument in favor of the construction we think should be put upon the statute. It is succinctly stated by Mr. Justice Bradley in Butler v. Boston Steamship Co., 130 U. S. 527, 9 Sup. Ct. 612, 32 L. Ed. 1017. From an early period the maritime law of the commercial nations of the continent of Europe had accorded to the owners of ships this limitation of liability to the value of the ship and freight earned; but this limitation was not allowed when the liability was incurred with the privity or knowledge of the owner. The maritime law of the continent was not accepted by the English courts, and was rejected by the courts of this country. The acts of 1851 and 1884 have established in the United States the rules of the general maritime law upon this subject, and in almost the identical language in which those rules have been expressed in the Codes and text-books of the countries in which the general law had been embodied. As Mr. Justice Bradley said, in reference to the divergence in this country from the general maritime law, and the return thereto by the enactment of the statutes here for the relief of shipowners, "We have rectified that." And we are convinced that the general understanding of the courts of this country is that the statutes here enacted have restored the old rule for the like occasions, namely, when the liability of the owner has occurred without his own

participation in the cause or creation of the liability. The suggestion of Mr. Justice Bradley in Butler v. Boston & Savannah Steamship Co., although not necessary to the decision of that case, seems to have been generally adopted as indicating the proper construction. Indeed, prior to that decision, the statutes, including that of 1884, had received that construction by Judge Brown in the Southern District of New York in the Amos D. Carver (D. C.) 35 Fed. 665, Force v. Providence Ins. Co. (D. C.) 35 Fed. 767, and Miller v. O'Brien (D. C.) 35 Fed. 779. And in later decisions that learned and distinguished judge maintained the doctrine he had previously declared. Laverty v. Clausen (D. C.) 40 Fed. 542; Gokey v. Fort (D. C.) 44 Fed. 364; Douse v. Sargent (D. C.) 48 Fed. 695. It was also approved by Judge Nelson in the district of Massachusetts in McPhail v. Williams (D. C.) 41 Fed. 61, and in Whitcomb v. Emerson (D. C.) 50 Fed. 128, and by Judge Webb in the district of Maine in the Giles Loring (D. C.) 48 Fed. 463.

In the case of Whitcomb v. Emerson, supra, and in Warner v. Boyer (D. C.) 74 Fed. 873, decided by Judge Butler, the statute of 1884 was held to relieve part owners from the consequences of contracts made by other part owners; and this upon the ground that shares are separately owned and so dealt with by the statute, and hence the non-participating owners were entitled to be relieved in respect of their shares. This is in entire accordance with the rule. Judge Butler in deciding the case last cited seems to have entertained the view that the acts of 1851 and 1884 were to be construed independently and not as in pari materia, but his actual decision was notwithstanding rested upon a principle which we regard as sound.

In the Circuit Courts of Appeals a like interpretation has been given to these statutes. In the case of The Republic, 61 Fed. 109, 9 C. C. A. 386, it was held by the Court of Appeals for the Second Circuit that the shipowner was not entitled to the limitation in respect of a loss which arose from the defective condition of his ship of which he was ignorant because of his own negligent examination of the vessel. The court said by Judge Wallace, referring to the eighteenth section of the act of 1884, "The section does not purport to repeal any pre-existing law, but is legislation in pari materia with the act of 1851" —and adopts the construction of Judge Brown in the cases above cited. This was a case of the negligent performance of a duty, and not a willful act of the owner. It would certainly be incongruous with this decision to hold the shipowner entitled to relief against his own contract. In the case of The Faxon, 75 Fed. 312, 21 C. C. A. 366 (the Circuit Court of Appeals for the Ninth Circuit), the limitation sought was for a loss occasioned by the explosion of the boiler of the vessel. The court recognized the distinction which had been made in previous cases between liabilities arising from causes within the knowledge or privity of the owner and those which are imputed to him because of his relation to the ship, but held that the owner was in that case entitled to the limitation for the reasons that the defect in the boiler was not one apparent to the owner, that it had been inspected by the government inspectors and repaired in accordance with their directions by a skilled marine engineer. The court was of opinion that the owner

had discharged his duty in respect of the condition of his vessel, and that, therefore, there was on his part no pesonal fault.

Another case in which this question was involved and which is much relied on by the appellee is Gilchrist v. Chicago Ins. Co., 104 Fed. 566, 44 C. C. A. 43, a case decided by the Circuit Court of Appeals for the Seventh Circuit, the opinion being by Mr. Justice Harlan. But an analysis of the opinion shows that it was decided upon the same construction of the statute of 1884 as had been made in the earlier cases. The vessel was stranded in Lake Huron on May 6, 1894. Underwriters had issued policies of insurance on the vessel which contained a provision that, "in case of loss or misfortune, the insured should give prompt notice to the insurer of the disaster and among other things make all reasonable exertions in and about the defense, safeguard and recovery of said vessel," and stipulated that the underwriters would contribute to the expenses. On the occurrence of the accident the master of the vessel summoned the libelant who went with tugs and wrecking apparatus to the rescue of the vessel, and finally, on May 18th, got her afloat; but on the next day she went down in a storm, only some remnants being saved. Thereupon the owner abandoned the vessel to the insurers as a total loss. While the libelant was engaged in rescuing the vessel an agent of the underwriters was sent to assist in the work. He remained some days, giving directions and approving what the master had done. A libel in personam having been filed by the owner of the wrecking outfit against the owner of the vessel and the underwriters, defense was made by the underwriters that they had never employed the libelant, and were not responsible for his services. They also severallly filed petitions for the limitation of their liability. Some of the facts here stated more fully appear from the report of the case in the court below. Gilchrist v. Godman (D. C.) 79 Fed. 970. Upon these facts the Court of Appeals held that at the time when the services were rendered the underwriters were the owners of the vessel, but solely because of the retroactive effect of the subsequent abandonment, which related back to the time of the disaster and vested the ownership in them as of that date, and that each of them was to be charged ratably with the payment of the libelant's claim; but that they were severally entitled to the benefit of the limitation of the act of 1884. The reason for this is thus stated in the opinion (page 573 of 104 Fed., and page 50 of 44 C. C. A.):

"The liability of the underwriters in the present case arises, not from any personal contract by them with the libelants, but from the rule of law which in the case of a valid abandonment, makes the insurer the owner of the vessel from the time of the original disaster."

It is evident that the learned justice recognized that the consequence would have been otherwise, if the underwriters, had made a personal contract. This inference is confirmed by his further statement that:

"The fact that the libelants might have looked to her [one of the defendants] as the original owner upon her personal contract made with them through her agent does not relieve the underwriters from the liability arising out of their becoming the owners of the entire property from the date of the disaster."

The substance of the decision was that the underwriters' liability was one which must be imputed to them because they were the owners, yet that this liability was subject to limitation because of the fact that it did not arise upon any personal contract made with them. The case is therefore in harmony with the other cases we have referred to.

In the First Circuit the question arose in Quinlan v. Pew, 56 Fed. 111, 5 C. C. A. 438, where it was held by the Circuit Court of Appeals that the owner was entitled to the relief where the liability arose from the neglect of the master to inform the owner of a defect in the fittings of a pennant of which defect the owner had no knowledge, but the whole course of the discussion by Judge Putnam shows that actual knowledge by the owner would have led to a different result. And, inasmuch as the accident happened some years after the enactment of 1884, it must be assumed that the court held that in this respect the qualification of the right to a limitation of liability contained in the act of 1851 was intended by the act of 1884.

These statutes have since been several times referred to in opinions by the Supreme Court, but in none of them has the question now before us been considered. We have the impression that the absence of any such question in the Supreme Court is due to the fact that counsel have generally regarded the rule as settled upon the suggestion of Mr. Justice Bradley in Butler v. Steamship Co., supra, by the general concurrence of the courts. The only discordant note is a passage in the third edition of Benedict's Admiralty, published soon after the enactment of the statute of 1884, wherein it is said in section 565 that the language of the act of 1884 would seem on its face to have removed the necessity of averring in the petition for limiting liability that the liability had been incurred without the knowledge or privity of the owner; that is, of the petitioner. And it is said that at the least the obvious construction of the act is that such privity or knowledge is not material. "But," it is said, "it has been decided in the lower courts that these words do not include the liability of the owner on his personal contract," referring to the cases of the Amos D. Carver, McPhail v. Williams, and The Loring, supra. Perhaps if other legislation upon the same subject, the history of the maritime law, the doctrines of the common law of contracts and the inconvenience to the public from so broad and unlimited an interpretation of the statute were all to be ignored, the construction contended for by the author would be legitimate, but that would be to disregard some of the most fundamental rules for interpreting the meaning of statutes.

Counsel for appellee invokes another rule of construction, and points to the language contained in the proviso at the end of section 18 of the act of 1884, which is:

"Nor, shall the same apply to wages due to persons employed by said ship-owners."

And says that the primary and usual office of a proviso is to except something out of a statute which would otherwise be within it. Undoubtedly this is a general rule of construction. But it is not universal,

and a proviso or an exception may be used for another purpose. The case of Baggaley v. Pittsburg Iron Co., 90 Fed. 636, 33 C. C. A. 202, decided by this court, is an illustration, where it was pointed out that an exception might be used from an excess of caution. And see what was said by Mr. Justice Story in Minis v. United States, 15 Pet. 445, 10 L. Ed. 791. No doubt the principal object of this exception was to protect the crews of vessels in respect of their wages, which has always been a matter of solicitude in legislation and of the courts. It is well known that they are hired sometimes by the owner of the vessel or his managing agent, and sometimes (and more generally in former times) by the master. Section 18 without this proviso would include wages due to seamen employed by him on his ship whether the contract of hiring was made by him, his manager, or the master. And we think it was intended by this exception to guard against an interpretation of the act which would affect the wages of employés by whomsoever hired. By "employed" is not meant those only who were hired by him personally. Of course, there would be no reason in such discrimination. If this was the intention of the exception, it throws no light upon the particular question of construction we are considering.

It is contended, however, that the liability in this case did not arise from any personal contract of the Mills Transportation Company. The principal ground on which this contention is urged is that the contract does not mention the company, that on its face it is the contract of Henry McMorran and the towing company. That it was made by him in a representative capacity for some one is clear. In respect of the Newago he was managing agent for the Mills Transportation Company which owned that vessel. And when these facts appear it is evident that he was making the contract for the company.

Story on Agency, § 160a; Mechem on Agency, §§ 769, 772; Higgins v. Senior, 8 Mees. & W. 844; Ford v. Williams, 21 How. 287, 16 L. Ed. 36; Higgins v. McCrea, 116 U. S. 671, 680, 6 Sup. Ct. 557, 29 L. Ed. 764; Barrell v. Newby, 127 Fed. 656, 62 C. C. A. 382, and the numerous authorities cited by Mechem in the notes to section 769, supra. It is not material that he also contracted for other parties. It was not by that circumstance any the less the contract of the Mills Transportation Company. The maxim, "Reddendo singula singulis," applies. That he had authority to make such a contract for that company cannot be doubted. In 25 A. & Eng. Encl. of L. 886, it is said:

"The owners of a ship generally appoint some person usually one of their number to be her manager. This person is called the 'ship's agent' or 'husband.' He is the general agent of the owners in relation to the ship, and may be appointed orally or in writing."

The third paragraph of the petition, after setting out the proposition and acceptance of July 9, 1903, alleges that they "constituted an agreement binding upon the Great Lakes Towing Company to render such towing and wrecking services as might be required by said vessels."

But it is unnecessary to determine whether the contract would bind that company in the absence of any proof that it had adopted it as its own. It was admitted by counsel that the services of the appellant

were requested and performed upon the footing of this contract. And, indeed, it is alleged in the appellee's petition:

"That in compliance with said request and under the agreement contained in said Exhibit A (which is the contract) hereto annexed the said Great Lakes Towing Company did send the tug Favorite with certain steam pumps aboard for the purpose of assisting said steamer."

If a principal not disclosed by a contract made by and in the name of his agent subsequently claims the benefit of it, it thereby becomes his own to the same extent as if his name had originally appeared as a contracting party.

The Mills Transportation Company, being a corporation, could act only through some agency. McMorran was the manager, and was vested with authority to make such contracts as this in behalf of the owner of the vessel, and the contract was the personal contract of the corporation, not in consequence of any principle peculiar to the maritime law, but by virtue of the common-law rules of agency.

But it is then said that the contract was made in behalf of the ship, and so was not the contract of the owner. This, however, rests upon an untenable theory. The contracts of the manager are the actual contracts of the owner, and are not of the same character as the contracts of the master made on a voyage or in foreign ports and which are imputed to the owner from the necessities of commerce. The acts of the managing agent within the sphere of his authority are as much the acts of the owner as if done by the owner himself. Only upon this theory could a corporation make what, for the purpose of making a distinction, is called a personal contract, that is to say, one which the owner himself or itself has made. Most of the cases which have been referred to were cases of negligence or some other tort of the owners, but, if as we suppose we should hold liabilities arising from contracts are included by the 18th section of the act of 1884, it must, we think, be admitted that, as the statute ranks them together and makes no distinction as regards the ground of liability, if negligence on the part of the owner deprives him of the right to a limitation, surely his voluntary creation of the liability ought with greater reason to bar his right to the limitation.

If it were an original question, we should have much doubt whether the act of 1884 was really intended to accomplish more than to make the provision for limitation by the act of 1851 applicable to cases of owners of the title of shares of the whole property in ships. But a further purpose in Congress has been recognized by other courts of co-ordinate jurisdiction, and we have deferred to that view.

The petition for the limitation of liability in this case misconceived the nature of the liability which the petitioner had incurred and which the towing company was seeking to enforce. The petition, after stating the rendering of the services under the contract and the loss of the vessel, proceeds to state as a ground for limitation that the stranding and loss of the vessel "were not done, occasioned, or incurred with the privity or knowledge of your petitioner or of any of its corporate officers, and your petitioner claims the benefit of the limitation of liability provided by" the statute. And the decree finds that this allegation was true, and evidently makes it the basis for according the

limitation. But the liability which this towing company was pursuing was not for any fault in the management of the Newago, but for services rendered under a contract with her owner in an endeavor to rescue her from peril and the question whether she was stranded and lost without the privity or knowledge of her owner was wholly immaterial. But the case has been argued as if the case were properly presented, and we have accordingly so dealt with it.

The decree of the court below which limits the liability of the appellee in respect of the claim of the appellant must to that extent be reversed, with costs. The amount due thereon will be ascertained, and such further proceedings had as the rules and practice of the court require.