## THE ETNA MARU.

District Court, S. D. Texas, at Galveston.
June 4, 1927.

No. 1290.

1. **Shipping** ⬅️42(1)—**Fire on steamship being loaded with sulphur by charterer held due to defect which rendered ship unseaworthy.**

A fire and explosion on a steamship during loading of a cargo of sulphur by charterer *held* due to giving way of defective hatch support, which precipitated a quantity of sulphur into the hold, causing friction, which produced the fire, and which defect rendered the ship unseaworthy for the purpose of the charter.

2. **Shipping** ⬅️42(2)—**Fire resulting from unseaworthiness before commencement of voyage held due to "owner's neglect," within fire statute (Rev. St. § 4282 [Comp. St. § 8020]).**

The duty of an owner to furnish a seaworthy ship, which he has expressly contracted to do by charter, is nondelegable, and if the ship is not made seaworthy before commencement of the voyage, and by reason of such condition a fire occurs, it is through the "owner's neglect," and he is not entitled to the exemption of the fire statute (Rev. St. § 4282 [Comp. St. § 8020]).

In Admiralty. Suit by the Texas Gulf Sulphur Company against the steamship Etna Maru, with the Kokusai Kisen Kabuchiki Kaisha, as claimant, and cross-libel by claimant. Decree for libelant, and dismissing cross-libel.

Lockhart, Hughes & Lockhart, of Galveston, Tex., for libelant.

Hunt, Hill & Betts, of New York City, and Armstrong & Cranford, of Galveston, Tex., for claimant.

HUTCHESON, District Judge. In this suit the Texas Gulf Sulphur Company, libelant, seeks to recover of the steamship Etna Maru fire and water damage to part of a cargo of sulphur which the libelant, as charterer, was at the time loading in the vessel, alleging that the fire and consequent damage was caused by the giving away of the hatch beam supporting the 'tween-deck

hatch; that the hatch beam failed because its support was broken, and that the vessel was therefore unseaworthy to handle the cargo agreed upon between the libelant and the owner of the Maru; that the damage was therefore the proximate result of the negligence of the steamship, its owners and agents, and of their failure to comply with their contract with reference to the seaworthiness of the vessel.

The claimant, Kokusai Kisen Kabushiki Kaisha, appeared as claimant owner of the vessel, and, while admitting that there was damage, declared that the damage was due to the fault of the libelant in loading the steamship, the duty of loading being, as alleged, on the libelant. In addition it invoked the Act of Congress of March 3, 1851, the fire statute (9 Stat. p. 635 [Comp. St. §§ 8020–8027]), which in terms protects an owner from loss by fire happening on board a vessel, unless the fire was caused by design or neglect of the owner. The owner also filed a cross-libel for damages sustained as the result of the fire on the vessel.

[1] At the trial it appeared without controversy that there was a fire; that the hatch beam gave way, precipitating the cargo into the hold, with considerable damage resulting. What caused the fire, what caused the hatch beam to give way, whether it was unseaworthy, and, if so, whether such unseaworthiness was caused by the design or neglect of the owner, within the meaning of the section of the fire statute invoked, were vigorously contested. Much evidence was taken and much argument followed.

There was evidence that small sulphur fires were common; that they were usually produced by friction, causing combustion of the sulphur dust raised by the operation of loading and handling; that these fires were usually quickly put out and caused little damage; that the fire in question was of unusual magnitude and gravity, both as evidenced in the explosion and in the duration of it; and that it must have proceeded from a cause different from the ordinary frictional fires occurring from time to time of loading processes.

The libelant's position is that the clip supporting the hatch beam gave way first, and the explosion occurred immediately after the giving way as the result of it, either from the beam rubbing against the hatch coamings in going down, causing a spark, or from a spark caused when the beam struck the bottom, or from a spark when it careened over and struck the side of the tank, or that the 300 tons of sulphur, being suddenly dislodged by the carrying away of the beam and thrown into the lower hold, caused an immense amount of friction on the hatch coamings; that this created sparks, and an explosion followed in the 'tween-deck.

Defendant claims that, since the force of the explosion was manifested by the blowing out of the partitions in the 'tween-dock and other damage there, with practically no evidence of damage in the hold, the explosion must have occurred first, causing the hatch beam to give way; that, if the clip was defective, that was immaterial, because the explosion 'tween-deck, without fault on the part of the claimant, and not the giving way of the hatch beam, was the cause of the fire and the damage.

That the clip was defective, that the defect had been of long standing, and that the vessel was unseaworthy, in that the hatch beams were not sufficient to support the load over an empty hold at a time prior to the beginning of the voyage, I think clear; and I also find that it was the giving way of this defective clip which caused the fire and the explosion. The history of sulphur fires, showing that ordinary fires are easily extinguished and cause practically no damage, makes it perfectly clear that this fire sprung from some unusual cause, and it is not merely an inference from an inference, but accurate reasoning from facts established by the testimony to the conclusion that the clip broke, causing the hatch beam to be carried away, precipitating the sulphur into the hold; that great clouds of sulphur dust rose 'tween-decks, which the friction of metal with metal caused to suddenly and violently explode.

[2] It follows, from the finding that the vessel was unseaworthy, and that this unseaworthiness caused the fire and the consequent loss, that the cross-libel must be denied; and it also follows that, unless claimant prevails upon his defense under section 4282, Revised Statutes (section 8020, Compiled Statutes), the fire statute, judgment should go for libelant for its loss.

In this case there was not only the implied warranty of seaworthiness, but an express warranty as follows: "That the said vessel, being tight, staunch, and strong, and in every way fitted for the voyage, and to be maintained in such condition by the owners during the voyage, shall with all convenient dispatch sail and proceed to Galveston," etc.

Libelant takes the broad position that the fire statute does not apply; that the claimant, having contracted to furnish a seaworthy ship, was obligated to do so. Pendleton v.

Benner Line, 246 U. S. 353, 38 S. Ct. 330, 62 L. Ed. 770; The Loyal (C. C. A.) 204 F. 930; Great Lakes Towing Co. v. Mill Transp. Co. (C. C. A.) 155 F. 20, 22 L. R. A. (N. S.) 769; Benner Line v. Pendleton (C. C. A.) 217 F. 497. To which position claimant replies (1) that the Pendleton Case is authority only for the denial of the application of the "limited liability" and not the "fire" statute; (2) that it is authority only for a case where the charter party is executed by the owner, as distinguished from an agent.

With these contentions I am not able to agree. On the first, while it is true that the courts have held that there is a difference between "privity and knowledge" in the limited liability act, and "design or neglect" in the fire statute (see Hines v. Butler [C. C. A.] 278 F. 877; also Providence & N. Y. v. Hill, 109 U. S. 602, 3 S. Ct. 379, 617, 27 L. Ed. 1038), the ground upon which the owner in the Pendleton and other cases was denied limitation of liability, that, having made the contract, he must abide and perform it, applies equally to a case where the fire statute is invoked.

On the second point I think claimant's construction of the authorities entirely too narrow, that they are authority for the proposition that a contract of seaworthiness made by an owner, either in person or through an agent, is a contract which he must comply with, just as all other persons must comply with their contracts, and that neither the fire statute nor the limited liability statute was intended to protect a man against his own personal agreements.

It is true that Quinlan v. Pew (C. C. A.) 56 F. 119 (First Circuit), is authority for claimant's position, the court saying: "Neither can the proposition of the appellant be maintained, that the statute does not apply, because there was in this case a personal contract on the part of the owners, either express or in the form of an implied warranty, that the vessel was seaworthy. In nearly all the instances which the statute expressly enumerates as those to which the limitation of liability applies, there is necessarily an implied warranty, and frequently an express agreement in the form of a bill of lading; so that, if the contention of the complainant is correct, the wings of the statute would be effectually clipped."

But to the contrary of this are Great Lakes Towing Co. v. Mill Transportation Co. (C. C. A.) 155 F. 20, 22 L. R. A. (N. S.) 769, followed in the Second Circuit by The Loyal (C. C. A.) 204 F. 930, and Benner Line

v. Pendleton (C. C. A.) 217 F. 497, affirmed by the Supreme Court, 246 U. S. 357, 38 S. Ct. 330, 62 L. Ed. 770, an exhaustive and interesting opinion, in which, discussing the point here raised, the Circuit Court of Appeals says: "It seems to us that the distinction which the courts have drawn relates to the manner in which the contract is made, rather than to the character of the contract itself. The rule which has been established is that the shipowner may limit his liability as to contracts or obligations entered into by others on his behalf, or imputed to him by law; but he may not limit his liability upon contracts which he personally makes, or upon obligations which he personally assumes. * * * By a 'personal contract' we understand to be meant a contract made by the person or corporation to be bound as distinguished from one imputed to such person or corporation."

In short, if the contract is the contract of the owner as such, as to rent a vessel, or rent a seaworthy vessel, whether that contract is signed by the agent or the principal is wholly immaterial, provided only the person signing the contract has the authority to bind the owner to the terms of it, and this any authorized and qualified agent has the authority to do.

Libelant replies further to claimant that, if claimant is correct and the fire statute applies to this case, nevertheless libelant should recover, because libelant has established that the fire was caused by the neglect of the owner, and that he has done this in two ways:

(1) By showing that the vessel was not seaworthy at the beginning of the voyage, the duty to have it seaworthy being in law a nondelegable duty of the owner, and the failure to discharge it being his neglect. Benner Line v. Pendleton (C. C. A.) 217 F. 500, where the court said: "There can be no question but that it is the duty of the shipowner to provide a ship which is fit and competent for the cargo and particular service for which she is engaged. The carrier either expressly or impliedly warrants the seaworthiness of the vessel at the commencement of the voyage. * * * And this warranty that the vessel is fit at the beginning of the voyage is an absolute undertaking, which is not dependent on the owner's knowledge or ignorance that the ship is in fit condition to undergo the perils of the sea." The Caledonia, 157 U. S. 124, 15 S. Ct. 537, 39 L. Ed. 644.

(2) If the duty to make the ship seaworthy, imposed under the facts of this case

on the owner, was a delegable duty, as held in Quinlan v. Pew (C. C. A.) 56 F. 118, and other cases, and if the owner could have exonerated himself by making proof that he had entrusted to proper persons the discharge of that duty under proper provision, there is no proof in this case sufficient to relieve the owner from the imputation of neglect in the discharge of that duty.

I agree with libelant in his first contention, that a shipowner must make his vessel seaworthy before the beginning of the voyage, that this duty is nondelegable, and if it is not seaworthy on account of conditions existing before the beginning of the voyage, and fire springs from that condition, there is a neglect on the part of the owner, within the meaning of the fire statute, for which he must account, though it must be admitted that the decisions on the limited liability statute have left the matter in some confusion, with their illogical, and to my mind wholly unsound, holding that, where an owner delegates the job of furnishing a seaworthy vessel to another, he may have limitation, while, where he tries to do it himself, he cannot have.

It is my belief that those cases which strain at a distinction as to the nondelegable duty of furnishing a seaworthy ship between the owner himself, the superintendent, the managing agent, the president, and some subordinate agent are unsound; that the right to limitation or exemption is to be sought in the whole text of the acts, and that they plainly mean to say that the owner may have limitation or protection against the acts of the officers of the ship, the master, and the crew, who are in charge of and navigating his ship on her voyage, but that the owner is responsible for the proper discharge of those duties with reference to seaworthiness before the beginning of a voyage, which are properly chargeable as nondelegable duties to the owner, whether he undertakes personally to discharge them or delegates them to others.

Thus considered, all of the confusion and uncertainty of the law falls away. If the thing which caused the damage has to do with the seaworthiness of the ship, and if the condition existed before the ship put out from port, then the owner is liable, whether he inspected it himself or caused somebody else to inspect it. If the damage was caused by the act of the master, whether it consisted in negligently failing to keep the vessel seaworthy, or in any other thing which is chargeable to him, then the owner is not liable. So that I conclude that the nature of the thing complained of and the time when the defect arose are controlling, and not who examined or who provided for the examination and report on it.

Finally, I agree with libelant that, if the line of authorities giving the owner limitation where he has provided competent superintendence are controlling, and the owner may exonerate himself by proof that this unseaworthiness existed after the claimant had done everything necessary and reasonable to secure a seaworthy ship, the libelant is still entitled to recover here, because there is no proof sufficient to exonerate claimant from the responsibility arising from the established unseaworthiness, and this is found with due regard for and recognition of the rule that the burden is upon the libelant to prove that the damage was due to the neglect of the owner. It is merely stating that, when the libelant proves that the ship is unseaworthy, as here, that establishes the neglect of the owner, until he rebuts it by showing that he has done everything reasonable and proper to have the ship put in a seaworthy condition.

Let a decree be entered in favor of libelant, establishing liability, and referring the matter of damages to a commissioner.