**EARLE & STODDART, Inc., et al. v. ELLERMAN'S WILSON LINE, Limited.**

District Court, S. D. New York.
Aug. 19, 1930.

Bigham, Englar, Jones & Houston, of New York City (T. Catesby Jones and James W. Ryan, both of New York City, of counsel), for libelants.

Kirlin, Campbell, Hickox, Keating & Mc-Grann, of New York City (Cletus Keating, L. de Grove Potter, and James H. Herbert, all of New York City, of counsel), for respondent.

FRANK J. COLEMAN, District Judge.

Libelants were the various owners of a general cargo shipped under various bills of lading on the steamer Galileo, which was owned and operated by the respondent. The boat left New York at about 10:30 a. m. on August 28, 1926, bound for Hull, England,

and about six hours later, when she was off Fire Island, it was discovered that the coal in a temporary bunker was afire through spontaneous combustion. She returned to New York, where, partly as the result of shifting the coal and of pumping water into her, she sank two days later and became a total loss. Practically the entire cargo was lost, and libelants sue to recover its value on the theory of breach of contract of carriage.

There is no charge of fault in the conduct of any one after the discovery of the fire nor even after the departure of the ship from New York. Unquestionably, the immediate cause of the fire was the gross negligence of the ship's chief engineer in putting a new supply of coal on top of old coal that had become heated in the temporary bunker. The libelants contend that not only was the ship not seaworthy when she commenced the voyage, but that respondent had not exercised due care to make her so, and that therefore the respondent is liable for the loss of the cargo; while the respondent relies on the defense of the Fire Statute (USCA title 46, §§ 182, 187):

The Galileo was a steel general cargo steamer, shelter deck type, of 6,300 tons gross, regularly employed between New York and her home port in Hull, England. She was properly manned, equipped, and supplied and was rated in Lloyd's Register in Class A1. The only charge of unseaworthiness made by libelants relates to the temporary bunker in the 'tween-deck space, where the fire started, and to the coal in it.

It had been the practice to supply the ship with coal for a round trip, and to carry the fuel for the return voyage in various temporary bunkers. Due to a strike in England at that period, coal was obtained here for the round trip, and on the voyage in question the temporary bunkers were filled even though it was planned that the Galileo was not to return, because the surplus was to be transferred to another ship in Hull. When she arrived at New York on August 16th, she had 160 tons still remaining in the temporary bunker in the 'tween-deck space, which had not been consumed on the round trip. This coal was not removed when the ship was refueled for the voyage on which she was lost, but several hundred tons of the new supply was placed on top of it on August 26th. Two days later the ship departed and the fire was discovered in that compartment.

There are two aspects of the charge of unseaworthiness made by libelants: (1) The construction of the temporary bunker; and (2) the fact that the new supply of coal was placed on top of the old heated coal remaining in it.

It is undisputed that bituminous coal is in danger of spontaneous combustion if ventilation of the interior of the mass is permitted to a degree sufficient to allow oxidation of the coal, but insufficient to carry off the heat generated by the oxidation. Soft coal oxidizes when in contact with air, and the process is accelerated by an increase in temperature. The oxidation itself produces heat which, if not carried off, will accelerate the process to the point of ignition. Consequently, bunkers should be constructed so as to minimize the amount of air that may pass through the sides and bottom of the bunker into the mass of the coal, and some surface ventilation should be provided so as to carry off such gases as may be liberated. Putting a new supply of coal on top of an old pile ordinarily entails some danger, because the surface of the old pile, having been well aerated, is in process of oxidation, and the new mass on top of it prevents the dissipation of the heat; furthermore, in the case of "run of the mine coal," as here involved, there is apt to be such a segregation of lumps as to permit air channels between the old and the new masses, with a consequent supply of oxygen to the interior. If the old pile has already become hot, the danger of combustion from confining the heat by a superimposed new mass of coal is, of course, vastly increased.

The temporary bunker in which the fire started was a compartment extending across the entire width of the vessel, 50 feet, and was formed by erecting a wooden bulkhead athwartship at a distance of 35 feet forward of the permanent cross bunker. It was thus merely a part of the 'tween-deck cargo space inclosed between the wooden athwartship bulkhead and the forward wall of the permanent cross bunker. A large hatchway near its center gave access to it from the main deck.

The only questions in regard to its construction that need be considered in detail are whether this wooden bulkhead which separated it from the cargo space forward permitted air to pass into the interior of the mass of the coal to a dangerous degree, and, if so, whether this contributed to the fire. Such air would oxidize the coal piled against the bulkhead and the resultant heat would be confined within the mass, with the conse-

quence that there would be a tendency to spontaneous combustion.

Two other questions in regard to the temporary bunker were raised in the course of the trial which may be summarily eliminated. Objection was raised to the arrangement of the two ventilators from the compartment to the main deck, on the ground that a sufficient draft would not be created to properly ventilate the surface of the mass; but the overwhelming weight of the evidence is that this could not have contributed to the fire. Indeed, two of libelants' own experts concurred in that opinion (Parr and Stanley). Also, there was some mention of the possibility of air penetrating the mass of coal through the rear wall of the temporary bunker which separated it from the permanent bunker. The latter, however, was filled with coal which did not ignite spontaneously, and it is impossible that air could have passed from it into the temporary bunker and caused a fire there, especially if, as libelants claim, the combustion started in the forward part of the temporary bunker.

Considering, then, the adequacy of the wooden bulkhead which formed the forward wall of the temporary bunker, it was constructed of vertical planks, 10 inches wide, 5 inches thick, and 10 feet long, reaching from the floor to the top of the 'tween-deck space, and held in place by having their ends inserted into slots on the floor and on the ceiling. The slots were formed by horizontal lumber fastened to the floor and to the ceiling, with a space between parallel pieces sufficient to accommodate the ends of the planks. The edges of the planks were planed and were placed tight together, and wooden battens 3 inches wide were nailed over the crevices, from top to bottom and on both sides of the bulkhead. A dust curtain made of a closely woven fabric was nailed on the cargo side of the bulkhead, but, since it was not airtight, it was not important for our purpose.

The bulkhead was not absolutely air-tight, though it was dust-proof. Unquestionably some air could pass under the battens and through the crevices between the edges of the planks; also under the horizontal lumber and the ends of the planks. The amount, however, would be small unless there was a considerable difference in air pressure on the two sides of the bulkhead. This would not ordinarily occur because the cargo space forward and the bunker were inclosed between two steel bulkheads with nothing to cause a draft from one compartment to the other after the hatches were covered, except an im-

proper operation of the ventilators. The cargo space and the temporary bunker each had two ventilators designed as an intake and outgo for each compartment, and, if so operated, there could be no material draft through the bulkhead. Of course the oxidation of the coal and the heat generated would have a tendency to draw air from the vicinity, including the crevices in the bulkhead; but that would be in small quantities.

The ideal bunker is absolutely air-tight below the level of the top of the coal, but has probably never been attained. The nearest approach to it in practice is in permanent bunkers constructed entirely of steel. Temporary bunkers always have at least one wooden bulkhead which necessarily permits the passage of some air into the body of the coal.

The use of a wooden bulkhead on a bunker, whether permanent or temporary, and the consequent penetration of some air into the body of the coal, does not, in itself, make a ship unseaworthy; otherwise every vessel with a temporary bunker would be unseaworthy, and many more with wooden bulkheads on their permanent bunkers. The danger arising from the interior ventilation of the coal through the bunker wall is ordinarily obviated by not retaining the coal too long and by inspecting it from time to time and removing such parts as have become hot. These precautions have to be taken in even the best bunker, and in the case of those less safe they have to be increased.

The bulkhead in question was not the best type of wooden bulkhead from the standpoint of air-tightness. While I find that the planks and battens and horizontal pieces were all in good condition, other methods might have been adopted which would have been slightly more effective in excluding air. Sometimes wooden bulkheads are made of two thicknesses of overlapping planks, which would probably be more effective than single planks with battens on both sides. Sometimes paper is pasted over the crevices, which was not done in this case. Furthermore, caulking would probably have diminished the passage of air.

The preponderance of the evidence, however, is in favor of a finding that the bulkhead was reasonably suited to its purpose, and complied with the requirements of ordinary prudence. It was of a type in common use for bunkers, and, while that fact in itself does not prove that the bulkhead was sufficient, from all the evidence I am convinced that it was. The experts on the two sides, of

course, differed, but those for respondent had more weight. The principal ones for the libelants, Parr and Porter, had practically no maritime experience, and they with Stanley seemed to think that every bunker was unsafe which was not air-tight, a condition which cannot be attained in practice. On the other hand, the respondent produced the senior engineer surveyor for Lloyd's Registry in New York, a surveyor of the Board of Underwriters of New York, and the chief surveyor of the Bureau Veritas of the International Register of Shipping for the United States and others, especially Commander Star, whose testimony supports this finding.

In determining the adequacy of the bulkhead, there must be considered the normal period during which coal would be retained in the temporary bunker. The 160 tons had been in it for almost two months, which was longer than would be expected, as the Galileo was operated, yet no fire occurred in it until it was covered with a new supply. It is true that hot spots had developed in it, but these were not significant, because they are apt to occur in any bunker after such a length of time.

■ Not only was the bulkhead adequate in my opinion, but, even if it did fall below the proper standard of safety, I do not believe that fact can be held a contributory cause of the fire which occurred. This question has two aspects, in that it relates to the period before and to the period after the new supply of coal was loaded. At the time the new supply was put on top of it, the old coal was in a sloping mass against the bulkhead and the sides of the vessel, about 7 feet high and extending out about twice as far. Hot spots had developed in it of sufficient intensity to burn the boots of the trimmers. When the new coal was placed on top of it and thus confined the heat, I believe that the air which made possible further oxidation was either retained on the surface of the old pile or found access through the channels formed by the lumps in the new supply. It seems to me impossible that the air which continued the oxidation could have come through the bulkhead at the back of mass, especially in view of the fact that it only took two days for the fire to break out. It is impossible to determine with certitude where the combustion started, but I believe it much more likely to have first occurred over the hot spots which the trimmers encountered than back against the bulkhead. Assuming the heated condition of part of the old coal, I am convinced that the new supply would have caused a fire in even a perfect bunker.

As to the other aspect of the question, if it be assumed that the alleged deficiency of the bulkhead caused the heating of the old coal, I think it was merely a condition and not a contributing cause of the fire. Certainly the immediate cause was the gross negligence of the chief engineer in loading the new supply on top of the old coal which contained hot spots. These were of common occurrence in all types of bunkers, and, whatever the construction, were to be expected and guarded against before new coal was added. In themselves they would not have led to fire, because in normal course all the old coal would have been removed within a few days. Assuming that the bulkhead were deficient, it would be pure surmise to say that this caused the actual hot spots; but, even if that conclusion were reached, I believe that the deficiency merely gave rise to a condition in the coal which would be not unusual in a proper bunker, and was not a contributing cause of the fire which was really brought about by covering the coal with a new supply.

■ There remains for consideration the question whether respondent is liable on account of the unseaworthiness caused by the negligent act of the chief engineer in loading a new supply on the hot coal. Libelants claim that respondent failed in a nondelegable duty to have reasonable care exercised to make the vessel seaworthy before her departure. Concededly at the commencement of the voyage the Galileo had within her a condition so dangerous that a bunker fire was inevitable and did in fact result within six hours.

The Fire Statute, on which respondent relies for defense, provides (USCA title 46):

"§ 182. *Loss by Fire.* No owner of any vessel shall be liable to answer for or make good to any person any loss or damage, which may happen to any merchandise whatsoever, which shall be shipped, taken in, or put on board any such vessel, by reason or by means of any fire happening to or on board the vessel, unless such fire is caused by the design or neglect of such owner."

"§ 187. *Remedies Reserved.* Nothing in the five preceding sections shall be construed to take away or affect the remedy to which any party may be entitled, against the master, officers, or seamen, for or on account of any embezzlement, injury, loss, or destruction of merchandise, or property, put on board any vessel, or on account of any negligence, fraud, or other malversation of such master, officers, or seamen, respectively, nor to lessen

or take away any responsibility to which any master or seaman of any vessel may by law be liable, notwithstanding such master or seaman may be an owner or part owner of the vessel."

It is apparent that the statute was intended to distinguish between the neglect of the owner as such and the negligence of the ship's officers, and to relieve the owner from all liability for damage to cargo caused by fire unless the fire was caused by the neglect of the owner as such. In the case at bar, the fire was caused by the negligence of the ship's chief engineer. The libelants, however, contend that (1) as a matter of fact there was neglect by the owner in not maintaining such supervision as would have prevented or corrected the chief engineer's negligence; and (2) as a matter of law the negligence of the chief engineer is chargeable to the owner notwithstanding the distinction between the two in the statute.

■ In reference to the alleged actual neglect by the owner, it appears that respondent had no marine superintendent nor superintending engineer nor other similar shore representative at New York, though this was one of the terminals of the line. When the boat arrived here on her last voyage, it was not intended to carry back any surplus coal beyond what was needed for the journey home, but the respondent cabled directions to carry 850 tons additional for transfer to a sister ship. The master and the chief engineer thereupon decided to carry part of this additional coal in the 'tween-deck temporary bunker, and the chief engineer alone decided to load it on top of 160 tons which remained from the previous voyage. The owner was chargeable with notice that the 'tween-deck compartment might be used as a temporary bunker, but had no notice that old coal remained in it, that this coal had hot spots, and that the new supply would be put on top of it. Respondent had previously given written instructions to its ship engineers (Exhibit G) including that of the Galileo, to see that coal was not permitted to remain in a bunker indefinitely, but was all cleaned out before new coal was added or at least put into such position that it would be used before the new coal.

The matter of determining whether to remove old coal from a temporary bunker before loading a new supply in it was within the province of a chief engineer of a steamer. It would be unusual for an owner or a shore representative to determine a detail of that sort, because it was an act of operation or management of the ship which would nat-urally be left to its officer. It was not neglect on the owner's part not to have a shore representative at New York, but, even if there had been one, he would not normally have participated in the chief engineer's decision on that point. There was no way in which respondent could have prevented the mistake except by having a shore representative supervise every detail of the operation and management of the ship while in port, which the law does not require.

Nor could due diligence on the owner's part have corrected the evil before the vessel commenced her voyage. Once the new supply had been loaded, no inspection of the temporary bunker would have disclosed the danger until about the time of the departure. Less than two days elapsed between the completion of the loading and the departure, and during most, if not all, of that period, an inspection would have been futile. There was therefore no neglect on the part of the owner as distinguished from that of the chief engineer which contributed to the fire.

■ Libelants' contention that respondent is liable for the loss even though it was caused solely by the negligence of the chief engineer is based on the theory that respondent was under a contractual obligation to the shipper that reasonable care be exercised by all concerned to make the vessel seaworthy before she left port. It is not contended that the doctrine of respondeat superior makes respondent liable, but that the negligence of the chief engineer caused a breach of contract on the part of the owner. The Fire Statute, however, was a part of the contract, and respondent's contractual obligation does not cut down such exemption as may have been granted by the statute.

Libelants construe the statute to mean that the exemption is granted only upon condition that the owner's general maritime obligation in regard to the seaworthiness of the vessel at the commencement of the voyage be fulfilled to the extent of having due care exercised by all connected with it, whether the owner's representatives or the ship's officers; in other words, that the distinction which the statute makes between the owner's neglect and the ship officers' negligence has no application to matters affecting the seaworthiness of the vessel at the commencement of the voyage. In support of this contention are cited many cases involving the Harter Act (46 USCA §§ 190–195).

It should be noted that the Fire Statute has no particular application to a vessel on a voyage, and makes no mention whatever of

its seaworthiness. In the Harter Act (46 US CA §§ 190–195), an express condition of the exemption from liability is that the owner exercise due diligence to make the vessel seaworthy, and the courts have construed this to include due diligence on the part of the officers. In the Fire Statute such express provision is entirely lacking, and the exemption is granted merely on the condition that the fire be not caused by the design or neglect of the owner, which is distinguished in the statute from the negligence or malfeasance of an officer. To adopt libelant's construction would be to read into the statute a provision similar to that expressly stated in the Harter Act (46 USCA §§ 190–195), which I believe is beyond the court's power.

In each of the cases upon which libelants rely, where an owner was held liable for damages caused by fire, there was actual neglect on the part of the owner as such, and not merely negligence of an officer of the ship. Arkell & Douglas, Inc., v. United States (C. C. A.) 13 F.(2d) 555; Bank Line v. Porter (C. C. A.) 25 F.(2d) 843; Williams S. S. Co. v. Wilbur (C. C. A.) 9 F.(2d) 622; The Etna Maru (C. C. A.) 33 F.(2d) 232. There are no expressions in these opinions indicating that the exemption given to owners by the Fire Statute excludes such acts of negligence by the ship's officers as cause the vessel to be unseaworthy before breaking ground. It is true that in the case of the Etna Maru the opinion in the District Court did contain such expressions [20 F.(2d) 143], but they were not approved in the Circuit Court of Appeals.

Finally, libelants contend that in the bills of lading respondent waived the protection of the Fire Statute. There are no provisions in the bills of lading that tend to indicate such an intention, but, if there were, they would be completely negatived by one of the following clauses, either of which appears in each bill of lading:

"It is also mutually agreed that this shipment is subject to all the terms and provisions of, and all the exemptions from liability, contained in the Act of Congress of the United States, approved on the 13th day of February, 1893, and entitled an 'Act relating to the navigation of vessels,' etc., and to sections 4281 and 4287, each inclusive, of the United States Statutes."

"This shipment is subject to the provisions of sections 4281–4286, inclusive, of the Revised Statutes of the United States."

Decree for respondent.